## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2011-NMSC-041**

**Filing Date: October 31, 2011**

**Docket No. 32,000**

**STATE OF NEW MEXICO,**

       **Plaintiff-Appellee,**

**v.**

**ADRIANA CABEZUELA,**

       **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Don Maddox, District Judge**

Jacqueline L. Cooper, Acting Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**MAES, Justice**.

**{1}** Adriana Cabezuela (Defendant) directly appeals her conviction for intentional child abuse resulting in the death of her eight-month-old-daughter, contrary to NMSA 1978, Section 30-6-1(H) (2005), alleging that (1) the jury was improperly instructed as to the elements of intentional child abuse resulting in the death of a child under the age of twelve; (2) the State failed to present sufficient evidence from which the jury could have found beyond a reasonable doubt that Defendant intentionally abused her child; (3) the testimony of the supervising pathologist regarding the baby's autopsy violated the Confrontation

Clause; and (4) the prosecutor engaged in multiple incidents of prosecutorial misconduct. We conclude that (1) the jury was improperly instructed as to the elements of intentional child abuse resulting in the death of a child under the age of twelve, and (2) double jeopardy does not bar retrial because there was sufficient evidence to support the jury's verdict. We reverse Defendant's conviction and remand for a new trial. Because the claims of prosecutorial misconduct were not preserved and we remand for a new trial, we do not address that claim.

{2} Although our determination of the jury instruction claim is dispositive of Defendant's appeal, to provide guidance to the trial court on remand, we address Defendant's Confrontation Clause claim. *See State v. Juan*, 2010-NMSC-041, ¶ 20, 148 N.M. 747, 242 P.3d 314.

## I. FACTS AND PROCEDURAL HISTORY

{3} We begin with a summary of events based on DVD video recordings of Defendant's three police interviews. At Defendant's trial, the police interviews were entered into evidence and played for the jury. Additional facts will be set forth as necessary to address Defendant's claims on appeal.

{4} Defendant was the mother of six children. In June 2007, Defendant's three youngest children, including eight-month-old Mariana Barraza (Baby Mariana), resided with Defendant in a small, one-bedroom rental home. Defendant's boyfriend, Leonardo Samaniego, Jr. (Boyfriend), had recently moved into Defendant's home.

{5} On June 14, 2007, shortly after midnight, Baby Mariana was rushed to the emergency room after she stopped breathing. The emergency room nurse asked a police officer, who was at the medical center with another suspect, to look at Baby Mariana's body, which was covered in bruises and bite marks. At 3:46 a.m., Baby Mariana was pronounced dead.

{6} A short time after their arrival at the hospital, a Hobbs police officer transported Defendant and Boyfriend to the Hobbs police station. During Defendant's initial police interview, she eventually agreed with the detective that due to the stress of caring for three small children she had lost her temper with Baby Mariana. Defendant admitted that a few weeks earlier she bit Baby Mariana on the leg and cheek. She also admitted that on a separate occasion she shook Baby Mariana to the point of bruising. When asked about the day of the incident, June 13, 2007, Defendant recalled that while she was at her storage shed with Baby Mariana lying in a baby carrier, she hit Baby Mariana on the head with an open hand and shook the baby carrier.

{7} On the night of Baby Mariana's death, Defendant admitted that she "pitched" Baby Mariana to the floor from the height of about one foot. She then picked Baby Mariana up "real quick" without supporting her head. As she "jerked" Baby Mariana up from the floor,

2

Baby Mariana gasped and stopped crying. Defendant stated to the detective, "I would never hurt my babies." Defendant insisted that Boyfriend had never hurt her children.

{8}     At the end of the first interview, detectives informed Defendant that Baby Mariana had died. Defendant requested that she tell Boyfriend of Baby Mariana's death. Without the detectives present, but as the DVD continued to record, Boyfriend entered Defendant's interrogation room. Boyfriend looked toward the camera before he turned to Defendant in tears. After Defendant informed Boyfriend of Baby Mariana's death, she whispered to him, "I put the blame on myself that I bit her . . . that I threw her." Defendant was arrested at the police station and charged with child abuse resulting in the death of a child.

{9}     A Hobbs police detective interviewed Defendant a second time the following day. Defendant again stated that she was not covering for Boyfriend and he had never been abusive toward her or her children.

{10}     Almost two years later, and three days before the trial was scheduled to start, Defendant requested a third police interview. Defendant revealed that Boyfriend was responsible for Baby Mariana's injuries, and she did not implicate Boyfriend earlier because he had previously threatened her and her children.

{11}     Defendant additionally gave a different account of the day of the incident. Defendant explained that while she was at her storage shed getting clothes for her children, Defendant heard Baby Mariana cry from the car where Boyfriend was watching the children. When Defendant returned to the car, she noticed a bruise on Baby Mariana's forehead and a cut above her left eye. Defendant did not question Boyfriend about Baby Mariana's injuries because "he was already frustrated," and she was "scared . . . of him."

{12}     Defendant also gave a different account of the night of Baby Mariana's death. She told the detective that all three children began to fuss in the middle of the night and both Defendant and Boyfriend went into the children's bedroom. Defendant stated that as she stood between the playpen and the crib, Boyfriend picked up Baby Mariana and left the room. Defendant then "heard just a thump," but thought Boyfriend had kicked the door as he walked from the room with Baby Mariana. Boyfriend then told Defendant to turn on the lights because Baby Mariana was not breathing.

{13}     Unable to revive Baby Mariana, Defendant, Boyfriend, and the children went down the street to Boyfriend's father's home to call an ambulance because Defendant's house did not have a phone. The police and the ambulance arrived shortly thereafter, and Baby Mariana was rushed to the hospital. Defendant and Boyfriend were initially at the hospital with Baby Mariana, but were then transported to the police station. While in the police car Boyfriend told Defendant, "You know what you have to say. Don't let them twist it around."

**{14}** Defendant stated that Boyfriend threatened her regularly, saying if she ever went outside the house he would kill her and if she "disrespect[ed]" him she was "gonna get it." Defendant also claimed that Boyfriend had abused her three younger children. Defendant said that Boyfriend had bitten Baby Mariana more than once because he was "anxious," and that he had shaken her.

**{15}** The jury found Defendant guilty of intentional child abuse resulting in Baby Mariana's death. In accordance with NMSA 1978, Section 31-18-15(A)(1) (2005), Defendant received a life sentence followed by five years of parole. Defendant appeals her conviction pursuant to Rule 12-102(A)(1) NMRA and Article VI, Section 2 of the New Mexico Constitution, which provide for direct appeal from the trial court when a sentence of death or life imprisonment has been imposed. *See State v. Trujillo*, 2002-NMSC-005, ¶ 8, 131 N.M. 709, 42 P.3d 814.

## II. DISCUSSION

### A. The jury instructions do not accurately reflect the statutes and case law.

**{16}** The State charged Defendant with "Abandonment or Abuse of a Child Resulting in Death." The criminal information described the offense as "knowingly, intentionally, and without justification, caus[ing] Mariana Isabelle Barraza, a child under 12 years of age, to be placed in a situation that may [have] endanger[ed] the child's life or health, resulting in Marian[a] Isabelle [Barraza's] death, contrary to [NMSA 1978, Sections 30-6-1(D)(1) and 30-6-1(H)]."

**{17}** This Court has adopted Uniform Criminal Jury Instructions that set out the elements for intentional child abuse. UJI 14-602 NMRA ("Child abuse; intentional act or negligently 'caused'; great bodily harm; essential elements."). The General Use Note for Uniform Criminal Jury Instructions provides, in part:

> Except for grand jury proceedings, when a uniform instruction is provided for the elements of a crime, a defense or a general explanatory instruction on evidence or trial procedure, the uniform instruction must be used without substantive modification or substitution. In no event may an elements instruction be altered or an instruction given on a subject which a use note directs that no instruction be given. For any other matter, if the court determines that a uniform instruction must be altered, the reasons for the alteration must be stated in the record.

**{18}** Following the language set forth in UJI 14-602 and UJI 14-610 NMRA, the trial court issued an elements instruction (Instruction No. 3) and an instruction defining "intentionally" (Instruction No. 4).

INSTRUCTION NO. 3

4

For you to find Adriana Cabezuela guilty of child abuse resulting in death, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  Adriana Cabezuela caused Mariana Barraza to be placed in a situation which endangered the life or health of Mariana Barraza;

2.  The defendant acted intentionally;

3.  Adriana Cabezuela's actions or failure to act resulted in the death of Mariana Barraza;

4.  Mariana Barraza was under the age of 18.

5.  This happened in New Mexico on or about the 14th day of June, 2007.

INSTRUCTION NO. 4

A person acts intentionally when the person purposely does an act. Whether the defendant, Adriana Cabezuela, acted intentionally may be inferred from all of the surrounding circumstances, such as Adriana Cabezuela's actions or failure to act, conduct and statements.

*See* UJI 14-602 ("Child abuse; intentional act or negligently 'caused'; great bodily harm; essential elements."); UJI 14-610 ("Child abuse; 'intentional'; defined.").

**{19}**  Defendant claims that Instruction No. 3 included both intentional and negligent theories of child abuse, and it was "impossible to tell under which theory the jury returned a guilty verdict." Defendant also argues that Instruction No. 3 improperly instructed the jury as to the elements of intentional child abuse resulting in the death of a child. Specifically, Defendant argues that the phrase "failure to act" should have been omitted because such language aligns itself solely with a negligent child abuse theory. In addition, Defendant claims that the jury did not find Baby Mariana to be less than twelve years of age, an essential element of the crime.

**{20}**  The State's theory of the case was that either Defendant's intentional actions or intentional failure to act resulted in Baby Mariana's death. The State argued at trial that Defendant's failure to act in protecting Baby Mariana qualified as intentional child abuse because UJI 14-610's definition of "intentionally" includes a defendant's failure to act.

**1.    Standard of Review**

**{21}**  "[Jury instructions] are to be read and considered as a whole and when so considered they are proper if they fairly and accurately state the applicable law." *State v. Hamilton*, 89 N.M. 746, 750, 557 P.2d 1095, 1099 (1976). "[A]n erroneous instruction presents an error without cure." *State v. Parish*, 118 N.M. 39, 44, 878 P.2d 988, 993 (1994) "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally,* 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "If the [issue] has been preserved we review the instruction for reversible error." *Id.* If the issue has not been

5

preserved, we review for fundamental error. *Id.* In this case, defense counsel preserved the jury instruction claim when he objected to the inclusion of the words "failure to act" in Instruction No. 3, and therefore, we review for reversible error.

**{22}** "Reversible error arises if . . . a reasonable juror would have been confused or misdirected." *Parish*, 118 N.M. at 42, 878 P.2d at 991. "A juror may suffer from confusion or misdirection despite the fact that the juror considers the instruction straightforward and 'perfectly comprehensible' on its face." *Benally*, 2001-NMSC-033, ¶ 12 (citing *Parish*, 118 N.M. at 44, 878 P.2d at 993). "Thus, juror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12.

### 2.      Definition of Intentional and Negligent Child Abuse

**{23}** The definition of abuse of a child is set out in Section 30-6-1(D) as "consist[ing] of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be" placed in a dangerous situation, tortured, or exposed to the weather. Section 30-6-1(A)(3) defines "negligently" as "refer[ring] to criminal negligence and means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." Although the Legislature defined "negligently" for purposes of the criminal child abuse statute, the Legislature did not define "intentionally" and did not include the phrase "failure to act" in Section 30-6-1.

### 3.      Permitting and Causing Child Abuse

**{24}** The Uniform Criminal Jury Instructions provide two different instructions for negligent child abuse resulting in death. When a defendant negligently *causes* child abuse resulting in death, UJI 14-602 is given to the jury, whereas when a defendant negligently *permits* child abuse resulting in death, UJI 14-603 NMRA is given. However, when a defendant's intentional act of child abuse results in the death of a child, only UJI 14-602, the same instruction for negligently causing child abuse, is presented to the jury.

**{25}** Because UJI 14-602 provides the essential elements for both intentionally and negligently causing child abuse resulting in death, some of the elements listed in UJI 14-602 are alternatives, placed in brackets, with an explanation that only the applicable alternative or alternatives are to be used. UJI 14-602 Use Note 2 ("Use only applicable alternative or alternatives."). The trial judge must determine which alternatives are to be used. In this case, Instruction No. 3 permitted the finding that Defendant was guilty of child abuse resulting in death by her "*actions* or *failure* to act result[ing] in the death of Mariana Barraza." (emphasis added).

**{26}** *State v. Leal* clarified that under Section 30-6-1(D)'s definition of criminal child abuse, "'cause' and 'permit' are distinct. One is active, the other passive." 104 N.M. 506,

509, 723 P.2d 977, 980 (Ct. App. 1986). "'[P]ermit' refers to the proscribed act, the passive act of allowing the abuse to occur." *Id.* at 510, 723 P.2d at 981. By prohibiting both causing and permitting child abuse,

> the legislature intended to provide flexibility. Since abuse will frequently occur in the privacy of the home, charging a defendant with "causing or permitting" may enable the state to prosecute where it is not clear who actually inflicted the abuse, but the evidence shows beyond a reasonable doubt that the defendant either caused the abuse or permitted it to occur.

*Id.* at 509, 723 P.2d at 980. When correctly charged and proven, this statute allows the State to charge a defendant, alternatively, with causing or permitting child abuse when it is not clear who inflicted the abuse. *Id.* However, "[w]hen the state chooses to charge under only one portion of the statute (that defendant 'caused' or defendant 'permitted' the abuse) the prosecution is limited to proving what it has charged." *Id.*

**{27}** In this case, the State only charged Defendant with intentionally causing Baby Mariana to be placed in a situation which endangered her life, resulting in Baby Mariana's death. As a result, the State never proffered a negligent child abuse jury instruction.

**4.      Intentional child abuse occurs only when a defendant causes the abuse.**

**{28}** The criminal child abuse statute is silent on whether a defendant's "failure to act" in protecting a child constitutes intentional child abuse. Therefore, we look both to this Court's and the Court of Appeals' application of Section 30-6-1 to determine whether a defendant's "failure to act" can result in an intentional child abuse charge, or if such a charge is reserved for those defendants who actively cause harm to the child.

**{29}** In *State v. Adams*, the mother and father were convicted of child abuse resulting in the death of their daughter. 89 N.M. 737, 738, 557 P.2d 586, 587 (Ct. App. 1976), *overruled on other grounds by Santillanes v. State*, 115 N.M. 215, 225 n.7, 849 P.2d 358, 368 n.7 (1993). The Court of Appeals stated that the "inference from the evidence [was] that the physical abuse came from [the mother]," and that the father "contend[ed], and the State agree[d], that his conviction was based on negligence." *Id.* The Court addressed "not whether [the father] allowed the abuse but whether he was *negligent in failing to take action* in connection with the abuse." *Id.* (emphasis added). The Court determined there was substantial evidence to prove that the father was negligent in failing to take action regarding his daughter's abuse at the hands of another. *Id.* at 738-39, 557 P.2d at 587-88.

**{30}** In *State v. Williams*, the defendant was convicted of child abuse for the criminal abuse that her husband inflicted on her four-year-old daughter. 100 N.M. 322, 323, 670 P.2d 122, 123 (Ct. App. 1983), *overruled on other grounds by Santillanes*, 115 N.M. at 225 n.7, 849 P.2d at 368 n.7. The defendant conceded that it was her husband that criminally abused her child. *Id.* The Court of Appeals determined that to

7

uphold the conviction the evidence must show that on May 29, 1982, [the] defendant negligently, and without justifiable cause, permitted her daughter to either be placed in a situation that might endanger her life or health, or be cruelly punished, and that this abuse resulted in great bodily harm to the child.

*Id.* The Court upheld the defendant's conviction for child abuse because the defendant's "*failure to remove* her child from the situation or her failure to seek help at the time of the incident was a proximate cause of [the child's] injuries," which provided sufficient evidence for a rational jury to find guilt beyond a reasonable doubt. *Id*. at 324, 670 P.2d at 124 (emphasis added).

**{31}** The most recent example in New Mexico of a defendant being charged with negligent child abuse versus intentional child abuse for a failure to act is *State v. Lopez*, 2007-NMSC-037, ¶ 28, 142 N.M. 138, 164 P.3d 19. The defendant in that case stated that on the night of the incident she was in the bedroom of her mobile home with the child's father and others, and "that she had two to three beers prior to falling asleep at approximately 10:00 p.m." *Id.* ¶ 5. The father and the two uncles remained awake, and when the defendant woke the next morning, the child was "bruised, pale, and not breathing." *Id.* Although the father's and the uncle's statements were "largely silent with regard to [the defendant's] actions or knowledge during the last two days of [the child's] life," both placed the defendant in the room the night of the abuse. *Id.* ¶ 26. In *Lopez*, this Court held that statements made by the defendant placing her in the same room as the child being abused supported the charge of negligently permitting child abuse resulting in death. *Id.*

**{32}** The distinction between intentional child abuse resulting in the death of a child under the age of twelve and negligent child abuse resulting in the death of a child bears important practical consequences. The severity of the sentence that the Legislature has provided for the crime of intentional child abuse resulting in the death of a child under the age of twelve, a life sentence, indicates that the Legislature meant to punish only the most deliberate and reprehensible forms of child abuse under this crime. In contrast to the severe punishment for intentional child abuse resulting in the death of a child under the age of twelve, negligent child abuse resulting in the death of a child carries a much lower maximum punishment: eighteen years. *See Garcia v. State*, 2010-NMSC-023, ¶¶ 9-10, 148 N.M. 414, 237 P.3d 716. In *State v. Adonis*, we looked to the relative severity of the punishment for first-degree and second-degree murder in assessing the required showing of intent that the Legislature intended for each crime. 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P.3d 717. We concluded that "[t]o prove first-degree murder, the State has a heightened burden [in proving intent] commensurate with the [greater] severity of punishment reserved for that crime." *Id.* ¶ 14.

**{33}** Similarly, in this case, the Legislature has reserved a more severe punishment for intentional child abuse resulting in the death of a child under the age of twelve than negligent child abuse resulting in the death of the same child. *See Garcia*, 2010-NMSC-023, ¶¶ 9-13.

8

Therefore, we conclude that the Legislature did not intend to "lump within [intentional child abuse]" other forms of abuse committed with a lesser degree of intent, specifically failure to act to prevent another from abusing the victim child. *Adonis*, 2008-NMSC-059, ¶ 15 (internal quotation marks and citation omitted). Accordingly, a defendant's failure to act to protect a child from abuse aligns with a negligent theory of child abuse in which the defendant permits or fails to act to prevent the abuse. This is in contrast to the defendant causing the abuse, which aligns with an active, intentional theory of child abuse.

{34} In this case, Instruction No. 3 contained two distinct theories of child abuse. The first theory was intentional child abuse. In her first two police interviews, Defendant stated she caused the abuse by her actions toward Baby Mariana. The second theory was negligent child abuse. In her third police interview, Defendant stated she permitted the abuse by not protecting Baby Mariana from Boyfriend.

{35} Similar to the facts in *Lopez*, neither party disputes that Defendant was in the vicinity of both Boyfriend and Baby Mariana when the abuse occurred. 2007-NMSC-037, ¶ 5 (noting that the defendant was in the same room as the individuals who actually abused the child, but was unaware of what happened because she was asleep). According to statements in her third police interview, however, Defendant did not abuse Baby Mariana. Defendant claimed that Boyfriend carried Baby Mariana from the children's room, and it was while Defendant was with the other children that she heard a "thump." Defendant initially thought the "thump" was Boyfriend hitting the door on the way out of the children's room. Boyfriend then told Defendant to turn on the light because Baby Mariana was not breathing.

{36} UJI 14-602, the jury instruction for intentionally causing child abuse, is a misstatement of the relevant law because the instruction, when it includes the phrase "failure to act," does not follow the language of Section 30-6-1. In addition, because of Defendant's statements in her third police interview, Defendant should have received UJI 14-603, if requested, the jury instruction for negligently permitting child abuse. There is no doubt that a reasonable jury, presented with an intentional child abuse instruction that misstated the law and void of an additional instruction that proffered the negligent child abuse theory, would have been misdirected by the instructions tendered at Defendant's trial. *See Benally*, 2001-NMSC-033, ¶ 12 ("Thus, juror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law."). Accordingly, we reverse Defendant's conviction of intentional child abuse resulting in the death of a child and remand for a new trial.

{37} We request that the UJI Committee for Criminal Cases (the Committee) review UJI 14-602, along with UJI 14-603 and UJI 14-610. In particular, we suggest that there should be separate instructions for negligent and intentional child abuse. We also raise a concern with the definition of "intentionally" in UJI 14-610. In 1993, the Committee defined "intentionally," for criminal child abuse purposes, to occur "when the person purposefully does an act. Whether the _____ (*name of defendant*) acted intentionally may be

9

inferred from all of the surrounding circumstances, such as [the defendant's] actions or failure to act, conduct and statements." UJI 14-610. This language, however, runs contrary to the definition of child abuse as defined by Section 30-6-1, which does not reference a defendant's failure to act in the definition of intentional child abuse.

### 5.      Omission of an Essential Element that the Child Was Under the Age of Twelve in the Intentional Child Abuse Jury Instruction

**{38}**    We next address Defendant's claim that Instruction No. 3 omitted an essential element of intentional abuse resulting in the death of a child: that the jury find the child to be under the age of twelve. Element 4 of Instruction No. 3 required the jury to find that "Mariana was under the age of 18." "The language of a statute determines the essential elements of an offense." *State v. Padilla*, 2008-NMSC-006, ¶ 41, 143 N.M. 310, 176 P.3d 299 (Chávez, C.J., dissenting). Section 30-6-1(H) explicitly states that for a defendant to be guilty of a first-degree felony resulting in the death of a child, the abuse that results in the child's death must be intentional, and the child must be less than twelve years of age.

**{39}**    It is "'the fundamental right of a criminal defendant to have the jury determine whether each element of the charged offense has been proved by the state beyond a reasonable doubt.'" *State v. Nick R.*, 2009-NMSC-050, ¶ 37, 147 N.M. 182, 218 P.3d 868 (quoting *State v. Orosco*, 113 N.M. 780, 786, 833 P.2d 1146, 1152 (1992)). Such determinations "cannot be ruled on by a trial court as a matter of law and taken from the jury's consideration, no matter how obvious the existence of any essential element of an offense may seem." *Id.* Accordingly, Instruction No. 3 incorrectly required the jury to find that Baby Mariana was under the age of eighteen, rather than under the age of twelve.

### B.      The State presented sufficient evidence from which the jury could have found beyond a reasonable doubt that Defendant intentionally abused her child.

**{40}**    We next address Defendant's sufficiency of the evidence claim to determine whether a retrial would implicate double jeopardy protections. *See State v. Dowling*, 2011-NMSC-016, ¶ 18, 150 N.M. 110, 257 P.3d 930; *State v. Mascareñas*, 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221 ("By addressing [the defendant's] claim of insufficient evidence and determining that retrial is permissible, we ensure that no double jeopardy concerns are implicated."). "If we find that sufficient evidence was presented at trial to support a conviction, then retrial is not barred. We review Defendant's claim under the erroneous instruction provided to the jury at trial." *Dowling*, 2011-NMSC-016, ¶ 18 (internal citation omitted).

**{41}**    Defendant claims that the State failed to present sufficient evidence to support her conviction of intentional child abuse resulting in the death of a child because there was insufficient evidence to prove beyond a reasonable doubt that Defendant committed the abuse. The State argues that there was sufficient evidence to convict Defendant of

intentional child abuse resulting in the death of Baby Mariana, either through her actions or her failure to act.

**{42}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). This Court views "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. However, in determining the sufficiency of evidence, we must scrutinize "the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

**{43}** Defendant does not dispute that Baby Mariana died due to a blunt force injury to the head and that the cause of death was homicide. Rather, Defendant argues that the State lacked sufficient evidence to prove it was Defendant who abused Baby Mariana. Defendant argues that the strongest evidence presented by the State to prove Defendant abused Baby Mariana was Defendant's three interviews with police.

**{44}** In Defendant's first two police interviews, she admitted to harming Baby Mariana on both the day and the night of the incident. In her third police interview, Defendant stated it was Boyfriend who harmed Baby Mariana.

**{45}** Defendant argues that her statements in the third police interview "provided a plausible explanation of what had actually happened," and that although the jury did not have to accept her third version of the facts, "her explanation should not simply be disregarded by this Court." However, contrary evidence offered by Defendant does not warrant a reversal "because the jury is free to reject Defendant's version of the facts." *Rojo*, 1999-NMSC-001, ¶ 19. In this case, regardless which of her statements the jury found to be credible, Defendant admitted to either abusing Baby Mariana or failing to protect Baby Mariana from the abuse by Boyfriend. Thus, the evidence adduced was sufficient.

**{46}** Defendant also argues that the psychological testimony presented by Dr. Kenney, that she was suffering from post-traumatic stress disorder, established that it was possible that Defendant falsely confessed to hurting Baby Mariana in order to protect herself and her children. Dr. Kenney noted that it is not uncommon for individuals in a high-stress situation, such as Defendant's, to confess to something they did not do. Dr. Kenney's testimony, that Defendant could have lied about harming Baby Mariana, does not negate the fact that she failed to act to protect Baby Mariana from Boyfriend.

11

**{47}** Our review of the record reveals that there was sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Defendant intentionally abused Baby Mariana, either through her actions toward Baby Mariana or through her failure to act to protect Baby Mariana from Boyfriend. Because we find that there was sufficient evidence to convict Defendant, Defendant's retrial is not barred by double jeopardy implications.

**C.     The testimony of the supervising pathologist regarding the autopsy did not violate the Confrontation Clause.**

**{48}** Defendant claims that Dr. Michelle Barry's expert testimony violated the Confrontation Clause, U.S. Const. Amend. VI, because, as the supervising pathologist, she did not actually perform Baby Mariana's autopsy. The State argues that Dr. Barry's testimony was properly admitted because, as the supervisor, Dr. Barry had personal knowledge of the examination; her testimony included her own opinion, reached by reviewing records prepared with the assistance of another doctor; and even if the trial court erred in admitting the testimony, the error was harmless.

**{49}** Under the Confrontation Clause, "[o]ut-of-court testimonial [hearsay is] barred . . . unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280 (internal quotation marks and citation omitted). We generally review Confrontation Clause claims de novo. *See State v. Lasner*, 2000-NMSC-038, ¶ 24, 129 N.M. 806, 14 P.3d 1282. However, because this claim was not preserved, we review only for fundamental error. *See State v. Martinez*, 2007-NMSC-025, ¶ 25, 141 N.M. 713, 160 P.3d 894; *see also State v. Dietrich*, 2009-NMCA-031, ¶ 51, 145 N.M. 733, 204 P.3d 748 (noting that the defendant failed to preserve the confrontation issue before the trial court, and therefore the Court will analyze it only for fundamental error). "A fundamental error occurs where there has been a miscarriage of justice, the conviction shocks the conscience, or substantial justice has been denied." *Dietrich*, 2009-NMCA-031, ¶ 52. "The first step in reviewing for fundamental error is to determine whether an error occurred. If that question is answered affirmatively, we then consider whether the error was fundamental." *State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192 (internal citation omitted).

**{50}** Dr. Barry testified that Dr. Ann Bracey, a forensic pathology fellow, performed Baby Mariana's autopsy. Although Dr. Barry did not perform Baby Mariana's autopsy, she was the supervising pathologist for this autopsy; she went "through every key feature with Dr. Bracey," which included the "microscopic exam, examination of the body and the injuries, examination of all the photographs." Dr. Barry explained that because of her involvement in the autopsy, both her name and Dr. Bracey's name appeared on the reports, and that in her testimony she would be referring to "*our* autopsy report" in order to be as accurate as possible.

12

**{51}** Defendant relies on the U.S. Supreme Court's opinion in *Melendez-Diaz v. Massachusetts* to argue that autopsy results are testimonial statements which should be introduced at trial by the doctor who performed the autopsy. 557 U.S. ___, ___, 129 S. Ct. 2527, 2531 (2009). In *Melendez-Diaz*, the Supreme Court held that the admission of certificates prepared and sworn to by analysts at a state crime laboratory, identifying a substance as cocaine, were testimonial statements which triggered the defendant's rights under the Confrontation Clause. *Id.* at ___, 129 S. Ct. at 2531-32. The Court recognized that although there may be "other ways—and in some cases better ways—to challenge or verify the results of a forensic test," "[s]ome forensic analyses, such as autopsies . . . cannot be repeated," and therefore the Confrontation Clause is crucial in such instances to protect a defendant's Sixth Amendment rights. *Id.* at ___ & n.5, 129 S. Ct. at 2536 & n.5.

**{52}** Defendant's reliance on *Melendez-Diaz* is flawed. In *Melendez-Diaz*, the State submitted three "certificates of analysis" showing the results of the forensic analysis performed on the seized substances without having the analysts testify in court. *Id.* at ___, 129 S. Ct. at 2531. This case is materially different in that the autopsy report was never entered into evidence and Dr. Barry, who "went through every key feature" of the autopsy with Dr. Bracey, testified at trial. Unlike the defendant in *Melendez-Diaz*, Defendant had a full and fair opportunity to cross-examine Dr. Barry to determine whether Dr. Barry had personal, first-hand knowledge of how Dr. Bracey conducted the autopsy and what Dr. Bracey found by observing the autopsy. *See Bullcoming v. New Mexico*, ___ U.S. ___, ___, 131 S. Ct. 2705, 2709-10 (2011) (finding a Confrontation Clause violation where the testifying analyst "had neither participated in nor observed the test on Bullcoming's blood sample"). Absent such cross-examination, the record before us supports a reasonable inference that Dr. Barry had personal knowledge of and participated in making the autopsy report findings by virtue of her own independent participation in the microscopic exam, examination of the body and the injuries, and examination of all the photographs. Therefore, the record supports a conclusion that Dr. Barry had sufficient personal knowledge to testify as to what Dr. Bracey discovered through the autopsy. There was no error in the admission of Dr. Barry's testimony at trial.

**D.     Did the State engage in multiple incidents of prosecutorial misconduct?**

**{53}** Defendant claims that the State committed multiple incidents of prosecutorial misconduct when the State made biblical references during closing arguments, misrepresented the fact that use immunity for Boyfriend had been obtained, and failed to make a witness in State custody available for an interview. Defendant concedes that the claims of prosecutorial misconduct were not preserved at trial. Because we have reversed Defendant's conviction of intentional child abuse resulting in the death of a child and remanded for a new trial, we do not address these issues.

**III. CONCLUSION**

**{54}** We hold that (1) the jury instructions presented by the trial judge, though properly derived from the Uniform Jury Instructions issued by this Court, resulted in reversible error because the jury was improperly instructed as to the elements of intentional child abuse resulting in the death of a child under the age of twelve; (2) the State presented sufficient evidence from which the jury could have found beyond a reasonable doubt that Defendant intentionally abused her child; and (3) the testimony of Dr. Barry, the supervising pathologist regarding Baby Mariana's autopsy, did not violate the Confrontation Clause. Accordingly, we reverse Defendant's conviction and remand for a new trial.

**{55}** **IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for _State v. Cabezuela_, Docket No. 32,000**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-CT | Confrontation |
| CT-DJ | Double Jeopardy |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CF | Capital Felony |
| CL-CN | Child Abuse and Neglect |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-MP | Misconduct by Prosecutor |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CJ | Criminal Jury Instructions |

JI-IJ                      Improper Jury Instructions