This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                    **NO. S-1-SC-34581**

**RIGOBERTO RODRIGUEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Kenneth H. Martinez, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**CHÁVEZ, Justice.**

{1} Defendant Rigoberto Rodriguez was convicted of multiple felony counts for his participation in a double murder. A jury convicted Defendant of two counts of premeditated first-degree murder by a deliberate killing, two counts of felony murder with armed robbery as the predicate felony for both counts, and four counts of conspiracy. The district court merged the two convictions for felony murder with the two first-degree murder convictions. The court did not merge any of the conspiracy convictions.

{2} Defendant raises several issues on appeal that can be grouped into four categories. First, Defendant argues that the district court erred in admitting time lines and maps regarding calls from various cell phones for lack of foundation, stating more specifically for the first time on appeal that the basis for the objection was hearsay and a violation of the Confrontation Clause. U.S. Const. amend. VI; N.M. Const. art. II, § 14. Second, Defendant claims that the evidence was not sufficient to support his convictions under the Due Process Clause. U.S. Const. amend. V; N.M. Const. art. II, § 18. Third, Defendant maintains that the district court failed to instruct the jury on attempted armed robbery when the predicate felony for felony murder was either armed robbery or attempted armed robbery. *See* UJI 14-202 NMRA; UJI 14-2801 NMRA. Fourth, Defendant contends that the Double Jeopardy Clause requires

that three of the four conspiracy convictions be vacated because there was only one overarching conspiracy.  U.S. Const. amend. V; N.M. Const. art. II, § 15.  For the following reasons, we affirm all of Defendant's convictions except for three of his conspiracy convictions.

## I.      BACKGROUND

{3}      On January 27, 2010, Jarlena Anderson was in her bedroom watching television in a house that was also occupied by her sister, Connie Maldonado (victim Connie), and David Maldonado (victim David), who was victim Connie's ex-husband.  Although Jarlena's bedroom door was closed, the walls were thin enough for her to hear victim David talking on the phone.  Victim David said that he was home alone, even though victim Connie and Jarlena were also there.  Jarlena overheard victim David tell victim Connie that "Rico" or "Rigo" was coming over.  Approximately five or ten minutes later Jarlena heard a beep from the home's alarm system, which suggested to her that someone had entered the house from the garage.  She heard victim David say that he "didn't have anything" and, in her opinion, "you could tell that there was fear in his voice."  Next she heard victim Connie say "Don't do this here.  Don't do this at my mom's house . . . ."  A male voice told victim Connie to "shut the f*** up."  Victim Connie said that "all they had was leather jackets."  For a moment everything was silent, then Jarlena heard a single gunshot.

3

After the gunshot, which killed victim David, Jarlena heard two men speaking in Spanish, but she did not understand what they said. Jarlena then heard victim Connie say "Why are you doing this, Rigo? Don't do this. I won't tell." Jarlena waited for a few minutes until it sounded as though the intruders had left, then ran across the street to her sister Benita's house. Jarlena and Benita returned to Jarlena's house, where they saw the victims' bodies and called 911 at 7:20 p.m. As we will discuss later in this decision, the timing of the call to the police was significant because cell phone records for phones belonging to both of the victims, Defendant, and his two alleged accomplices recorded that there had been calls between their phones shortly before the murders occurred, but not afterwards.

{4} Victim David was shot in the head by a bullet fired from six inches to a few feet away. Victim Connie bled to death from numerous stab wounds to her face, scalp, and neck. Victim Connie also had multiple cuts on her hands and wrists consistent with trying to defend herself from a knife attack.

{5} There were no eyewitnesses to the murders, DNA evidence did not implicate Defendant or his conspirators, and bloody footprints found at the scene were inconclusive. The State's case was based largely on circumstantial evidence and buttressed by Mario Martinez, who testified that Defendant had told him the details

of how Defendant and Jaime Rodriguez murdered the victims.

## II.    DISCUSSION

### A.    The Cell Phone Evidence Was Admissible

{6}    Evidence presented by the State at trial included phone calls that occurred shortly before the murders between cell phones that were alleged to belong to the victims; Defendant; Jaime Rodriguez, who is Defendant's brother; and Cassandra Kelso, who is Defendant's girlfriend and the owner of the getaway car.  Amber Dugan, an employee of Rocky Mountain Information Network, which provides assistance to police departments, was the State's final witness regarding the cell phone evidence.  The purpose of her testimony was to introduce charts of cell phone calls between the victims and their accused murderers based on cell phone records that had been admitted into evidence.

{7}    The Dugan exhibits that are at issue on appeal are Exhibits 122 through 125. When preparing her exhibits, Dugan relied on Sprint Nextel and Cricket records that had previously been admitted into evidence without objection as Exhibits 115, 119, and 120.  Exhibit 122 is a map based on Cricket records showing the latitudes and longitudes of the towers pinged by 315-1436, which was victim David's phone, and 435-5944, which was Kelso's phone, to indicate the locations of the phones between

the hours of 6:00 and 11:59 p.m. on the night of January 27, 2010. The map legend lists the phone numbers as being "Potentially Associated with Listed Names." The map shows the location of the crime scene and that both phones were communicating with the same tower near the crime scene. The map also identifies where Defendant was staying and shows that Kelso's phone was communicating with a tower near Defendant's house both before and after the murders.

{8} Exhibit 123 is a chart based on Sprint Nextel records showing calls dialed from and received by Defendant's cell phone, 353-6451, between 6:00 and 7:00 p.m. on the night of the murders. Four of the twelve calls were between Defendant's cell phone and victim David's cell phone, 315-1436. The other eight calls were between Defendant and Jaime.

{9} Exhibit 124 is a chart based on Cricket records showing calls dialed from and received by Kelso's cell phone between 6:00 and 7:30 p.m. on the night of the murders. Six of the twelve calls before the murders occurred were to 353-6450, a phone that Defendant shared with Kelso. Three of the other calls were to Jaime, one call was to victim Connie, and two calls were to victim David.

{10} Exhibit 125 is a chart based on Cricket records showing calls dialed from and received by victim David's cell phone, 353-6451, between 6:38 and 7:06 p.m. on the

6

night of the murders. Four calls were with Defendant's cell phone and two were with Kelso's cell phone, 435-5944.

{11} Early during Dugan's testimony and just after she identified Exhibits 115, 119, and 120 as the records she received in the case, defense counsel asked to approach the bench, where he objected to what he anticipated would be Dugan's testimony. The ground for his objection was the lack of foundation for Dugan to testify that 353-6451, the phone that was registered to Hector Rodriguez, belonged to Defendant, and the phone registered to Casandra Mendosa belonged to Cassandra Kelso. The district court denied Defendant's objection, stating that the evidence would be "more of a compilation and summary of the evidence that has preceded it," and therefore the objection for lack of foundation went to the factual weight the jury could determine to give the evidence rather than admissibility of the evidence as a matter of law.

{12} We examine the admission of this evidence for an abuse of discretion. *State v. Stanley*, 2001-NMSC-037, ¶ 5, 131 N.M. 368, 37 P.3d 85. We will reverse the district court's evidentiary ruling only if we conclude that the ruling is clearly untenable or not justified by reason because the ruling is against the logic, facts, and circumstances of the case. *See State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829. We conclude that the district court did not abuse its discretion because

7

prior testimony and exhibits that had been admitted into evidence supplied the foundation for the Dugan exhibits marked as Exhibits 122 through 125.

{13}     Agent Paul Hernandez from the United States Marshals Service, who investigated the ownership of the phones and the phone calls that were placed near the time of the murders did not testify, but the results of his investigation were referenced by Detective Paige Lavilla, who was the lead detective on the case and who investigated the cell phone records with Agent Hernandez.  Detective Lavilla's testimony regarding which cell phone number belonged to which person is set out in summary format for ease of reading.  She testified that

315-1392 belonged to victim Connie;

315-1436 belonged to victim David;

353-6451 was registered to Hector Rodriguez, but belonged to Defendant Rigoberto Rodriguez;

353-6450 belonged to Defendant and Kelso;

319-9680 belonged to Jaime Rodriguez; and

435-5944 was registered to Casandra Mendosa, but actually belonged to Cassandra Kelso.

{14}     Detective Lavilla acknowledged during direct examination that Agent Hernandez conducted the investigation to determine which phones belonged to

8

Defendant and to Kelso. During both cross-examination and recross-examination, Defendant emphasized that Detective Lavilla relied exclusively on Agent Hernandez to tie the phones registered to Hector Rodriguez and Casandra Mendosa to Defendant and Cassandra Kelso, respectively. Thus, rather than objecting to Detective Lavilla's testimony as hearsay during trial or moving to strike her testimony, Defendant left it for the jury to give the testimony the weight that the jury thought it deserved.

{15} Three other witnesses testified prior to Detective Lavilla about the cell phone numbers and who used the phones. Mario Martinez, who knew Defendant, testified that Defendant told him that Defendant and Jaime had committed the murders, and Martinez also testified about the details of the murders that Defendant had told him. Regarding the phone numbers, Martinez testified that

353-6451 belonged to Defendant;

353-6450 belonged to Defendant and Kelso; and

319-9680 belonged to Jaime Rodriguez.

{16} Jarlena, victim Connie's sister, testified that victim Connie's phone number was 315-1392 and victim David's was 315-1436. Sylvia Duran, who was Jaime's girlfriend at the time of the murders, testified under subpoena about the ownership and users of the cell phones in question. The only phone number that was not

accounted for by witnesses other than Detective Lavilla was 435-5944, which Detective Lavilla testified that Agent Hernandez told her belonged to Kelso.

{17} The State also introduced phone records from Sprint Nextel and Cricket. Norman Ray Clark, III, a records custodian with Sprint Nextel, authenticated various phone records that were admitted into evidence without objection. The records admitted as Exhibit 114 were for 353-6451, which Detective Lavilla and Martinez both attributed to Defendant. Phone number 353-6451 was associated with a prepaid phone, and the subscriber was listed as Hector Rodriguez. Addresses and names for Sprint Nextel prepaid phones are not verified, and if a customer does not give an address, Sprint Nextel assigns a standard address in Irvine, California, which was done with this prepaid phone number.

{18} Sprint Nextel call records also confirmed the cell phone identification. Exhibit 115 is the complete call record in this case for 353-6451, which was Defendant's cell phone, and Exhibit 123 is the summary of relevant calls in this case prepared by Clark. Between 6:39 and 6:51 p.m. on the night of the murders, Defendant's phone, 353-6451, placed two calls and received two calls from victim David's phone, 315-1436. Phone number 353-6451 also received two calls from Jamie's phone, 319-9680, during this same time frame. At 7:05 p.m., Defendant's phone moved so that

it was communicating with a cell phone tower on top of Sandia Crest, which has a much broader range than some of the other cell phone towers, and indicates that the phone was somewhere on the west side of Albuquerque. The murder scene was on the west side of Albuquerque. No activity was reported for Defendant's phone, 353-6451, between 7:05 and 11:07 p.m.

{19} Matthew Kase, a subcontractor who assists cellular service providers with legal compliance services for phone records, produced documents for Cricket concerning victim David's phone number, 315-1436, and Kelso's phone number, 435-5944. Exhibit 118 shows the subscriber profiles for 315-1436 and 435-5944 and identifies Connie Ortega as the registered owner of 315-1436, with the address the same as the house where the murders took place. Jarlena testified that both victim David and victim Connie used that phone. Detective Lavilla testified that victim Connie's cell phone, 319-1392, remained in the house where the murders took place and that she confirmed that the number of victim David's cell phone was 315-1436. Casandra Mendosa is listed as the registered owner of 435-5944. The 435-5944 phone is a PayGo phone without a contract. Cricket does not verify names associated with PayGo phones, and instead lists whatever name the customer provides on an online form. As with the Sprint Nextel records, the best evidence of who actually uses a

phone is not necessarily the subscriber profile, although the subscription documents are evidence for a jury to weigh with all of the other evidence to determine whether the State adequately established ownership and use of the phones in question.

{20} Exhibit 119 contains the call detail records for victim David's phone, 315-1436, from December 27, 2009 through January 27, 2010. Exhibit 120 contains the full call detail records for Kelso's phone, 435-5944, for the same time period. Exhibit 120 indicates that Kelso called victim Connie's phone, 315-1392, at 6:56 p.m. and victim David's phone, 315-1436, at 6:57 p.m. and 7:05 p.m. on the night of the murders. At 7:05 p.m. both Kelso's and victim David's phones were using the same cell phone tower. Exhibit 121 is a list of Cricket cell towers in Albuquerque with each tower's latitude and longitude. Exhibits 119 and 121 indicate that victim David's phone moved across the city after his death. Detective Lavilla had already testified that she tracked Defendant's and victim David's cell phones *after the homicides occurred* to a La Plata address where Jaime and Kelso lived with Jaime's girlfriend, Sylvia Duran, and where Defendant was staying. In addition, a black Chevy Impala owned by Cassandra Kelso and described as the getaway car was also located at the La Plata address.

{21} Defendant did not object to any of this detailed testimony and the

accompanying exhibits when it was proffered, although he challenged it on cross-examination. Accordingly, we conclude that the district court did not abuse its discretion in overruling both Defendant's objection for lack of foundation and admission of the Dugan exhibits.

{22} However, for the first time on appeal, Defendant contends that the testimony of Detective Lavilla and Dugan was inadmissible hearsay, and it violated his constitutional rights to confront and cross-examine witnesses against him. We decline to review these newly-raised objections because these arguments were not made to the district court, and defense counsel may have elected to cross-examine witnesses on the subject instead of objecting to the admissibility of the evidence in an effort to create doubt, as opposed to insisting that the prosecution bring in additional witnesses to repeat material that had already been admitted as evidence.[1] *See State v. Neswood*, 2002-NMCA-081, ¶ 18, 132 N.M. 505, 51 P.3d 1159 (declining to review an evidentiary objection that was not made at the time the evidence was offered).

{23} If we were to review the admission of Detective Lavilla's and Dugan's testimony we would do so under a "plain error" analysis because Defendant's hearsay

---

[1]The prosecution offered to bring Agent Hernandez to testify; however, whether Defendant declined the offer is not in the record.

13

and confrontation objections were not preserved. To conclude that there was plain error, we "must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 (internal quotation marks and citation omitted). Importantly, the alleged errors must be evaluated in the context of all of the testimony. *Id.* We are not convinced that the admission of the evidence from Detective Lavilla and Dugan creates grave doubts concerning the validity of the guilty verdicts because of the additional evidence that proves Defendant's guilt beyond a reasonable doubt. Therefore, we next turn to Defendant's contention that the verdicts are not supported by the evidence.

**B.      The Evidence Was Sufficient to Sustain Defendant's Convictions**

{24}      Appellate courts are bound by the facts that are established and found by the jury at trial. *See State v. Sutphin*, 1988-NMSC-031, ¶ 23, 107 N.M. 126, 753 P.2d 1314 ("A reviewing court may neither reweigh the evidence nor substitute its judgment for that of the jury."). Credibility is an issue for the jury to decide. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 45, 150 N.M. 654, 265 P.3d 705 ("[T]he jury is free to reject Defendant's version of the facts." (internal quotation marks and citation omitted)); *see also State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246

P.3d 1057 ("New Mexico appellate courts will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] [our] judgment for that of the jury." (first three alterations in original) (internal quotation marks and citation omitted)).

**i.      The evidence was sufficient to convict Defendant of armed robbery**

{25}    Defendant maintains that there was no evidence that victim David's cell phone was the motivation behind any use of force against him, and that even though the phone was stolen, the State failed to prove that "force or threatened use of force [was] the lever that serve[d] to separate the property from the victim." Defendant's argument is without merit. *See State v. Bernal*, 2006-NMSC-050, ¶ 28, 140 N.M. 644, 146 P.3d 289 (internal quotation marks and citation omitted). The jury was instructed that, to convict Defendant of armed robbery, they had to find beyond a reasonable doubt that "[D]efendant took the cellular phone by force or violence or threatened force or violence." *See* UJI 14-1621 NMRA; NMSA 1978, § 30-16-2 (1973).

{26}    Killing victim David is precisely the use of force that served as the lever to separate victim David from his property. *See Bernal*, 2006-NMSC-050, ¶ 28

15

("Robbery is not merely a property crime, but a crime against a person."). Victim David's body lay with his pants pockets turned inside out at the crime scene. The jury could draw the reasonable inference that David's body was robbed after he was murdered. In addition, Martinez testified that Defendant told him that the reason he and his brother Jaime killed the victims was to rob them, and Jarlena overheard David say, in a frightened voice, "he didn't have anything," and Connie say "all [we] had was leather jackets."

{27}     Based on the evidence presented at trial, the jury could have reasonably inferred that Defendant came to the victims looking to rob them of drugs, money, or objects of value, and when the victims told them they had nothing, Defendant killed them, searched them, and took victim David's phone. Therefore, substantial evidence supports the armed robbery convictions.

**ii.     There was sufficient evidence to connect Defendant to the murders**

{28}     Defendant argues that there was insufficient evidence of the killers' identities to connect him to the crimes because there is no DNA evidence that connects him to either the crime scene or the victims, and the police never tied a murder weapon or bloody shoes to him. Defendant also argues that Jarlena's testimony that she thought she heard the name "Rico," but could have heard "Rigo," is not proof beyond a

16

reasonable doubt.

{29}     Defendant's arguments are not persuasive. The names "Rico" and "Rigo" are similar enough to support the jury's reasonable inference that Jarlena actually heard victim David say "Rigo," which is Defendant's name. The cell phone evidence is circumstantial evidence that Defendant and victim David communicated with each other before the murders, but not afterward. Detective Lavilla testified that she was able to determine an approximate location where victim David's cell phone ended up after the murders. She identified the location as 120 La Plata, Northwest, Apartment 15, where Jaime, Sylvia Duran, and Cassandra lived, and where Defendant was believed to be staying. This address was also where Cassandra Kelso's black Chevy Impala was located, the car that Martinez testified that Defendant told him was used during commission of the crime. The State introduced Motor Vehicle Division records indicating that a 2005 gray or charcoal Chevy Impala was registered to Cassandra Kelso, which matched the license plate and vehicle identification number of the Impala found at the La Plata address. A canvassing of neighbors in the vicinity of the murders revealed what a neighbor described as a suspicious dark Chevy Impala around the time of the murders.

{30}     Martinez's testimony is also evidence of Defendant's involvement in the

17

murders. Detectives Russ Landavazo and Scott Elliot initially interviewed Martinez on February 10, 2010. Landavazo testified that Martinez knew details of the murders that the police had not yet released to the public. Martinez stated that the killer threw out a pair of shoes because they had blood on them. Martinez identified the dark Impala that he was told was used as the getaway vehicle, and he stated that the gun used in the murders had been given to Jeannie Arreguin. Detective Lavilla testified that she was not aware of any leaks of non-public information. Detective Lavilla also testified that Martinez's statements were consistent with the crime scene, including the order in which the victims were murdered, a description of bloody footprints found at the scene, and that three people, in addition to the victims, were involved in the murders.

{31}     On February 10, 2010, Martinez initially told police that Defendant contacted him hoping to get rid of a gun he used during the commission of the crime, and Martinez suggested that he give it to Jeannie Arreguin, who was a mutual friend of Martinez and Defendant. On February 11, 2010, Jeannie gave a statement to the police. Detective Lavilla stated that during her interview, Jeannie said that Defendant told her that Jaime "cut a woman with a knife" and "he was there." Jeannie also knew that somebody had been shot, and Martinez had given her a .38 semiautomatic pistol

18

that she sold the next day. She represented to Detective Lavilla that she sold the gun to her son's friend. The murder weapon was not recovered, but a .38 caliber bullet was taken from victim David's body. Therefore, taken as a whole, and viewed in the light most favorable to the verdict, *see State v. Astorga*, 2015-NMSC-007, ¶ 57, 343 P.3d 1245, the cumulative evidence presented by the State supports the jury's conclusion that Defendant committed the murders.

**iii.    The evidence was sufficient for a jury to find that victim Connie was murdered with deliberate intent on a theory of accomplice liability**

{32}    Defendant argues that the evidence suggests at best that the intent to kill victim Connie developed spontaneously, which only supports a second-degree murder conviction. We disagree. The evidence was sufficient to support the jury's verdict that Defendant was guilty of first-degree murder and conspiracy to murder victim Connie.

{33}    First-degree murder requires evidence of a "deliberate" intent to kill. NMSA 1978, § 30-2-1(A)(1) (1994). Deliberate intent requires a "calculated judgment" to kill, as opposed to a "mere unconsidered and rash impulse." UJI 14-201 NMRA. That calculated judgment, however, "may be arrived at in a short period of time." *Id.* In New Mexico, " '[a] person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he

19

did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted.' " *State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 (quoting NMSA 1978, § 30-1-13 (1972)). An accomplice "who aids or abets in the commission of a crime is equally culpable as the principal." *Carrasco*, 1997-NMSC-047, ¶ 6. An accomplice who is guilty of aiding and abetting receives the same punishment as the principal. *Id.*

{34} The district court instructed the jury on accomplice liability as to all charges with the exception of felony murder. Based on the evidence presented at trial, the jury could have found that although Defendant did not kill victim Connie himself, he is guilty as an accomplice to Jaime's deliberate murder of victim Connie. The evidence presented by the State supports that a rational jury could have concluded that Defendant and Jaime discussed what to do about victim Connie, ignored her pleas for mercy, and then murdered her with a knife during a vicious struggle. After Jarlena heard a gunshot, she heard two men speaking in Spanish, although she could not understand them, and she also heard victim Connie begging for her life. A rational jury could infer from this testimony that Defendant and Jaime discussed killing victim Connie, and the testimony that Defendant spoke with Jaime in Spanish met the accomplice liability element for counseling or encouraging Jaime to

20

deliberately murder victim Connie. *See* § 30-1-13. Therefore, substantial evidence supports the conviction for first-degree murder by deliberate intent on a theory of accomplice liability. Accordingly, we affirm Defendant's conviction for deliberate intent murder as to victim Connie based on accomplice liability.

**C.     Failure to Instruct the Jury on Attempted Armed Robbery as a Predicate Felony for Felony Murder Was Not Fundamental Error**

{35}     Defendant appeals his felony murder convictions on the ground that the district court committed fundamental error by instructing the jury only as to armed robbery, when it should have been attempted armed robbery. *See* UJI 14-202; UJI 14-2801. Defendant believes that failing to give the jury an instruction defining "attempt" constitutes fundamental error. These claims are without merit.

{36}     Robbery may serve as a predicate felony for felony murder in New Mexico. *See State v. Frazier*, 2007-NMSC-032, ¶ 27, 142 N.M. 120, 164 P.3d 1. Attempt crimes are lesser included offenses of their associated completed crimes. *State v. Andrada*, 1971-NMCA-033, ¶¶ 7, 11-12, 82 N.M. 543, 484 P.2d 763. Defendants generally have "the right to have instructions on lesser included offenses submitted to the jury. This right depends, however, on there being some evidence tending to establish the lesser included offenses." *State v. Anaya*, 1969-NMSC-130, ¶ 7, 80 N.M. 695, 460 P.2d 60. It has been well established that "it is not error to refuse to

21

instruct on a lesser included offense unless there is some evidence tending to establish the lesser included offense." *Andrada*, 1971-NMCA-033, ¶ 9. Fundamental error exists if a conviction "shock[s] the conscience because either (1) the defendant is indisputably innocent, or (2) a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *Astorga*, 2015-NMSC-007, ¶ 14 (alteration in original) (internal quotation marks and citation omitted); *see also* Rule 12-216(B)(2) NMRA.

{37} The district court instructed the jury, inter alia, on first-degree murder by deliberate killing, second-degree murder, voluntary manslaughter, and first-degree felony murder for each count of murder. The predicate felony element in the felony murder instructions submitted to the jury is "[t]he defendant Rigoberto Rodriguez committed or attempted to commit the crime of Armed Robbery under circumstances or in a manner dangerous to human life." The district court specifically instructed the jury on the elements of armed robbery, but not on attempted armed robbery, and the jury convicted Defendant of the completed crime of armed robbery. Because armed robbery may serve as a predicate felony for felony murder, and the jury convicted Defendant of armed robbery on the theory that Defendant took either victim David's or victim Connie's cell phone by force or violence, the predicate felony element of

22

felony murder was satisfied. *Frazier*, 2007-NMSC-032, ¶ 27. Victim David was dead, and his corpse lay with his pockets turned inside out. This is evidence that (1) indicated that he was robbed of his cell phone, and (2) supported a reasonable inference that Rigoberto and Jaime Rodriguez visited the victims with the intent to rob them, so that the jury had sufficient evidence to convict Defendant of robbery. *See Bernal*, 2006-NMSC-050, ¶ 28 (stating that the crime of robbery requires a use of force or intimidation against the victim). Therefore, it was not error for the district court to refuse to instruct on the lesser included offense of attempted robbery when the evidence indicated that if Defendant had indeed robbed the victim, he completed the robbery, and there was no evidence tending to establish mere attempted robbery. *Andrada*, 1971-NMCA-033, ¶¶ 9, 12, 15. Indeed, Defendant's conviction for felony murder on the basis of completed armed robbery does not shock the conscience. Defendant is not indisputably innocent. There was no mistake in the process that makes Defendant's felony murder conviction fundamentally unfair, notwithstanding his apparent guilt. Thus, Defendant's argument fails, and we deny his request to vacate his felony murder convictions.

**D. The District Court Should Have Vacated One of the Conspiracies to Commit Murder and the Two Conspiracies to Commit Armed Robbery and Tampering with Evidence as Merging with a Single Overarching Conspiracy to Commit Murder**

23

{38}    Defendant was convicted of conspiracy to murder victim David, conspiracy to murder victim Connie, conspiracy to commit armed robbery, and conspiracy to tamper with evidence.  Defendant contends that punishing him for all four conspiracies violates the Double Jeopardy Clause because the State did not overcome the presumption that multiple crimes are a part of one overarching conspiratorial agreement.  *State v. Gallegos*, 2011-NMSC-027, ¶ 55, 149 N.M. 704, 254 P.3d 655; *see also* U.S. Const. amend. V; N.M. Const. art. II, § 15.  "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state."  NMSA 1978, § 30-28-2(A) (1979).  The punishment for conspiracy depends on the highest crime conspired to be committed.  Section 30-28-2(B).  Our analysis of the double jeopardy question is governed by *Gallegos*, 2011-NMSC-027, ¶ 30.

{39}    We begin with the "rebuttable presumption that multiple crimes are the object of only one[] overarching, conspiratorial agreement subject to one[] severe punishment set at the highest crime conspired to be committed." *Id.* ¶ 55. The State has a heavy burden to overcome the presumption of one agreement, but it may do so if it establishes that (1) the location of the conspiracies is not the same, (2) there is not a significant degree of temporal overlap between the charged conspiracies, (3) there

24

is not an overlap of personnel between the conspiracies, (4) the overt acts that are charged, and (5) the roles played by the defendant in the charged conspiracies are not similar. *Id.* ¶¶ 42 (citation omitted), 56.

{40} When we examine the evidence in this case, it is clear that the State cannot meet its heavy burden of overcoming the presumption of one agreement. The location of the crimes of murder and of armed robbery was the same. The crimes of armed robbery, murder, and tampering with evidence were committed with a significant degree of temporal overlap. The members of the conspiracy did not change—Defendant and Jaime committed the armed robbery and murders, with Kelso driving her car to get them to and from the crime scene. The acts charged—murder and armed robbery—were acts that could or did cause death or serious injury. Defendant shot and killed victim David, he disposed of his shoes that had blood on them because he stepped in a pool of blood at the crime scene, and he disposed of the gun he used during the armed robbery and murder. The jury could reasonably draw the inference that Defendant encouraged his brother to kill victim Connie with a knife. All of this evidence points to one overarching conspiracy to commit murder and armed robbery and then to destroy evidence of the crimes to avoid prosecution. Although the State points out that Defendant was told by victim David that he was

25

alone at the house, this does not point to a separate conspiracy. Much like the objective of avoiding prosecution by disposing of the gun and the bloody shoes, the objective of avoiding prosecution by killing the eyewitness is part of the overarching conspiratorial agreement. *See id.* ¶ 62 (stating that the objectives of a single agreement may change without creating a new agreement so that a conspiracy to commit kidnapping should be understood as a continuous agreement that eventually embraces murder as an objective).

{41} Because we conclude that the State did not overcome the presumption of one overarching conspiracy, the appropriate remedy is to vacate three of the four conspiracy convictions and remand to the district court to impose a sentence on Defendant for the highest crime conspired to be committed. That crime is conspiracy to commit first-degree murder. *See* § 30-28-2(B)(1); NMSA 1978, § 30-2-1(A) (1994).

## III.   CONCLUSION

{42} We affirm all of Defendant's convictions with the exception of three of his conspiracy convictions. We remand to the district court to vacate the convictions for conspiracy to commit the murder of Connie Maldonaldo, conspiracy to commit armed robbery, and conspiracy to commit tampering with evidence. The judgment and

sentence should be amended to reflect a sentence for the crime of conspiracy to commit first-degree murder. All of Defendant's other convictions and sentences are affirmed.

{43}    **IT IS SO ORDERED.**


_____

**EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____

**CHARLES W. DANIELS, Chief Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**BARBARA J. VIGIL, Justice**


_____

**JUDITH K. NAKAMURA, Justice**