# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  December 22, 2016**

**NO. S-1-SC-34094**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JADRIAN LUCERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**Camille Martinez-Olguin, District Judge**

Bennett J. Baur, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Sri Mullis, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

{1}  Laticia May Lucero (Baby) died on June 9th, 2010, just 47 days after she was born to Mother and Jadrian "Jay" Lucero[1] (Defendant). Baby's autopsy revealed that she died as a result of "devastating brain injuries," the type of injuries one might expect after being ejected from a vehicle in a high-speed collision or falling from a third-story window and landing on one's head. During the investigation into Baby's death, Defendant told law enforcement that Baby was under his care on the afternoon of June 9th, and that he had found her "not breathing" when he went to check on her in her crib. Defendant was indicted on a single count of intentional child abuse resulting in Baby's death, and a jury convicted him of intentional child abuse resulting in the death of a child less than twelve years of age under NMSA 1978, Section 30-6-1(D), (H) (2009). The district court sentenced him to life in prison.

{2}  Defendant raises two issues in this direct appeal. First, he contends that the jury instructions improperly defined the intent element for the crime of intentional child abuse by endangerment and, therefore, resulted in fundamental error. Second,

---

[1]Appellate counsel informed this Court at oral argument that Defendant's name was misspelled throughout the district court proceedings as "Jadrain." We therefore refer to Defendant in this appeal as Jadrian, consistent with appellate counsel's representation.

Defendant contends that the district court abused its discretion when it refused to hold an evidentiary hearing on Defendant's motion for a new trial. We exercise jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. We affirm Defendant's conviction.

## I. BACKGROUND

### A. Factual History

{3}     A few days after giving birth to Baby, Mother, who was fifteen years old at the time, took the newborn home from the hospital to live with Baby's Grandmother. Defendant also moved into Grandmother's house to help Mother. In the weeks that followed, the young parents lived together and shared the responsibility of caring for Baby. Defendant would help feed and bathe Baby, though Mother was the primary caregiver.

{4}     After about two weeks, Grandmother asked Defendant to move out because Mother had "adjusted to taking care of the baby" and because Grandmother would be there if Mother needed anything. Defendant complied and moved back to his house, also in Grants, where he had been living before Baby was born. Mother believed that it was important for Baby to have a relationship with Defendant, so she and Defendant agreed that Baby would alternate where she slept every three nights,

2

between Grandmother's and Defendant's houses. When Baby was staying overnight at Defendant's house, he would care for her alone because Mother was under a curfew and was not allowed to spend the night away from home.

{5}     During the first month of Baby's life, Mother took her to the doctor's office for several check ups, and everything appeared normal. On June 3, 2010, just six days before Baby's death, Mother took Baby to an appointment to get certified for public assistance. At the appointment, Mother undressed Baby so that the nutritionist could weigh and measure her. The nutritionist later testified at Defendant's trial that Baby's height and weight were normal that day and that she did not observe "any bruising . . . [or] any abnormalities whatsoever."

{6}     Around the same time as the June 3rd appointment, Mother and Defendant agreed to let Baby spend the night with Defendant's mother, step-father, and younger brother and sister, who were visiting from Rio Rancho and staying at a Holiday Inn. The next day Mother noticed that Baby had a swollen lip and a bruised eyelid. Mother asked Defendant what had happened, and Defendant responded that "nothing was wrong with her, she looked fine." Mother testified that Baby was fussy and did not eat as much as usual while her lip was swollen.

{7}     Baby slept at Grandmother's house from June 6th through June 8th, and she

3

woke up there on June 9th at about 7:00 a.m. Mother noticed that morning that Baby was fussy and was eating less, sleeping more, and requiring diaper changes less frequently than usual. Believing Baby may have been constipated, Mother added corn syrup to her formula and asked Grandmother to feed her so that Mother could get ready for a court appointment. Grandmother testified that Baby did not drink very much but that "[s]he was good that morning" and that "[s]he got her to smile" and to "cuddle."

{8}     A short time later, Mother dropped off Baby at Defendant's house on her way to her court appointment, which was scheduled to begin at 8:30 a.m. When Mother left Defendant's house, Defendant was holding Baby and watching television, and Defendant's friend, George King, was asleep on the couch. Mother finished with her appointment at approximately 9:00 a.m. She returned to Defendant's house, checked on Baby, who was asleep in her crib, and sat down to watch television.

{9}     According to Mother, Baby woke up crying sometime in the early afternoon, and Mother picked her up and made a bottle. Baby ate less than normal and was looking at Mother without moving much. Mother then changed Baby's diaper and laid her back in her crib. Baby was still hungry and awake but Mother thought that everything was okay and went back to the living room to watch television. At around

4

3:35 or 3:40 p.m., Mother again left Defendant's house to go to a counseling appointment that was scheduled to begin at 4:00 p.m. Before leaving, Mother checked on Baby and found her sleeping. She gave Baby a kiss, heard her breathing, and thought that everything appeared to be okay. Mother arrived early for her appointment and was waiting outside when she received a call from Defendant who told her that Baby was not breathing. Once Mother confirmed that Defendant was serious, she began running back to his house. Around the same time, King called 911.

{10}	At 3:50 p.m., Lieutenant Maxine Spidle of the Grants Police Department responded to a report of a child not breathing at Defendant's address. She arrived at Defendant's house about two minutes later and got out of her car, ran past King who was standing outside, and found Defendant inside the house holding Baby limp in his arms. Lieutenant Spidle grabbed Baby and ran outside to give her to Emergency Medical Services (EMS) personnel who had just arrived. Lieutenant Spidle noticed that Baby's lips were discolored and handed her off to an EMS responder who began Cardiopulmonary Resuscitation (CPR). The Emergency Medical Technician truck then left with Baby to take her to the hospital. Mother and Defendant arrived at the hospital as medical personnel were trying to resuscitate Baby. The young parents eventually learned that Baby was going to be flown to the University of New Mexico

5

Hospital (UNMH) because "they couldn't keep her stable." Defendant, Mother, Grandmother, and Grandmother's husband started on their way to Albuquerque to meet the helicopter at UNMH, but about 20 minutes later they were called back to the hospital in Grants and notified that Baby had died. When Mother left the hospital with Defendant she was under the impression that Baby had died from sudden infant death syndrome (SIDS).

{11}     About a week later, however, Mother learned that SIDS had not caused Baby's death. Baby's autopsy revealed that her death was the result of "devastating brain injuries" caused by blunt force trauma. The State's two medical experts testified that Baby had a "complex radiating fracture" on the left side of her head with multiple fractures that crossed suture lines and extended to other bones in her skull. Both experts explained that a typical skull fracture for an infant who has been dropped or who has fallen off of a counter is linear and consists of a single crack that does not travel across a suture line to another bone. A complex radiating fracture, by contrast, usually results from "major trauma situations that . . . have a lot of force generated," such as being ejected from a vehicle in a high-speed collision or falling from a third-story window and landing on one's head.

{12}     The autopsy revealed extensive injuries to Baby's brain that also were

6

consistent with major trauma, including pooled blood within her brain's protective coverings and tearing of the brain tissue itself. The State's experts testified that these injuries could not have been caused by normal, or even rough, handling of a child, such as dropping her to the floor or allowing her to hit her head on "the edge of something." The State's experts further testified that after receiving her injuries Baby "immediately" would have been "visibly not well": she would not have made eye contact; she would not have been interactive; she might have been unconscious; her breathing might have been impaired; and "her whole body would not have . . . looked normal."

{13} In addition, Baby's autopsy revealed a number of other non-fatal injuries that were in various stages of healing. The infant had several broken bones, including a broken clavicle (collar bone) that showed no signs of healing and two fractured ribs that showed from "a few" to fourteen days of healing. She also had a torn upper frenulum, the small piece of tissue that connects the upper lip to the gum above the teeth, that showed signs of at least one day to possibly a few weeks of healing. The medical investigator testified that a baby with a torn frenulum "could have cried excessively and even refused the bottle" because of the pain caused by puckering the injured area.

7

{14}     Defendant did not testify at trial, but Lieutenant Spidle and Detective Kevin Dobbs of the Grants Police Department recounted their interview of Defendant that had taken place two days after Baby's death. At Mother's request, Defendant had gone to the police station, waived his Miranda rights, and agreed to speak with law enforcement about the events leading up to Baby's death. The officers interviewed Defendant for three-and-a-half to four hours.

{15}     Defendant repeatedly told Lieutenant Spidle that Baby was "fine" and "happy" when she and Mother arrived at his house on June 9th at around 8:00 a.m. He recalled that after Mother left for her court appointment that morning, he watched television with Baby for "a bit" and then put her down for a nap. Defendant said that Baby continued to sleep after Mother returned, and that he changed her diaper around noon and gave her a bottle around 2:00 p.m. He also said that throughout the day Baby showed no signs of illness.

{16}     Defendant told the officers that when Mother was getting ready to leave for her counseling appointment that afternoon, he saw her go to Baby's crib in the bedroom and bend down and kiss her. Lieutenant Spidle asked if Defendant knew whether Baby was breathing at that time, and Defendant said that he could tell that she was asleep because "she makes a little sound so he knew that she was okay when [Mother]

8

left." Defendant then recalled that, after Mother left, "he went outside for a minute, . . . then went to check on [Baby], [and] found that she was not breathing." According to Detective Dobbs, Defendant said that "he tried to give [Baby] CPR for about five minutes and yelled to [King] to help. Then [King] called 911, [and] went across the street and got help."

{17}   The officers also recounted Defendant's explanations for Baby's injuries. According to Lieutenant Spidle, when they first asked Defendant if Baby had ever been bruised or harmed in any way, he replied that "the [B]aby had never fallen, slipped, no one has ever fallen or slipped with the baby, [and she never] rolled off the couch, nothing of that sort." According to Detective Dobbs, Defendant also said that Baby had "gone to the hotel [one] night to stay with his parents, [and that] when she got back he noticed that there was swelling and bruising around her nose and eyes area." Defendant told the officers that "he believed his brother had kicked her while they were sleeping in the [same] bed."

{18}   The officers similarly described Defendant's responses to questions about whether he knew of any injuries to Baby's skull. Defendant denied for the first half of the interview that he knew anything about such an injury, but after approximately two-and-a-half hours of questioning, he recalled that about a week before Baby died

9

she had bumped her head on the side of the bathtub while he was bathing her. Defendant said that Baby had cried for about an hour after she hit her head, until he was able to calm her down. Later in the interview, Defendant also said that "he might have squeezed her."

{19} During Lieutenant Spidle's testimony, the State played a video excerpt of Defendant's interview for the jury. In the video, Defendant denied having hurt Baby, but he told Lieutenant Spidle, "[I]f you charge, don't charge [Mother] and my mom. . . . You can charge me, don't charge them. . . . I didn't do it, but don't charge them. . . . [b]ecause they didn't do it." The video ended with Defendant saying, "I could have accidentally did something. It's probably my fault."

**B.     Procedural History**

{20} On July 9, 2010, a Cibola County grand jury indicted Defendant on one count of "Child Abuse - Intentional (Resulting in Death)" for allegedly "caus[ing] [Baby], a child under the age of eighteen years, to be tortured, cruelly confined[,] or cruelly punished, to wit: a fractured skull and other injuries, which resulted in [her] death . . . a first degree felony, contrary to Section 30-6-1(D)." At trial, the State alleged that Defendant committed the acts by either slamming Baby's head into something, slamming something into her head, or punching Baby's head with his fist.

10

Defendant's theory was that Baby had already sustained her injuries and "started to crash before she ever got to [his] house" on the morning of June 9th.

{21}   At the close of the evidence, the parties and the district court agreed that the jury would be instructed using UJI 14-602 NMRA (2000), the elements instruction that was in effect at the time for intentional child abuse resulting in death.[2] The agreed-upon instruction included two of the three *actus reus* alternatives set forth under Section 30-6-1(D): abuse by torture, cruel confinement, or cruel punishment, and abuse by endangerment.[3] The parties and the district court also agreed, consistent with UJI 14-602, to use UJI 14-610 NMRA (1993) to define the term "intentionally." *See* UJI 14-602 use note 3 ("If this alternative is given, the definition of 'intentionally[,]'[] Instruction 14-610, must also be given.").

{22}   When the district court and the parties were reviewing the instructions, the State was careful to remind the district court that UJI 14-602 and -610 had to be

---

[2]Since Defendant's trial, this Court has withdrawn the instructions used in this case and approved new uniform jury instructions for use in child abuse cases. *See* UJI 14-611 to -625 NMRA. The new instructions were not in effect at the time of Defendant's trial.

[3]The third *actus reus* of child abuse under Section 30-6-1(D), causing or permitting the child to be exposed to inclement weather, was not implicated under the facts of this case. *See also* UJI 14-602.

11

modified under *State v. Cabezuela* to omit all references to a "failure to act" because the State was pursuing a conviction based only on a theory of intentional abuse. *See* 2011-NMSC-041, ¶¶ 36-37, 150 N.M. 654, 265 P.3d 705 (holding that a failure to act is inconsistent with a theory of intentional child abuse). Defendant did not object, and all references to a "failure to act" were removed from the instructions.

{23} The jury therefore was given the following elements and definitional instructions:

Instruction No. 10

For you to find [Defendant] guilty of child abuse resulting in death as charged in the indictment, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  [Defendant] caused [Baby] to be placed in a situation which endangered the life or health of [Baby]

OR

2.  [Defendant] caused [Baby] to be tortured or cruelly confined or cruelly punished

3.  [Defendant] acted intentionally and without justification;

4.  [Defendant]'s actions resulted in the death of [Baby];

5.  [Baby] was under the age of 12;

6.  This happened in New Mexico on or about the 9th day of June, 2010.

12

Instruction No. 11

> A person acts intentionally when the person purposely does an act. Whether [Defendant] acted intentionally may be inferred from all of the surrounding circumstances, such as [Defendant]'s actions[,] conduct[,] and statements.

The jury found Defendant guilty.

{24}     About three weeks after Defendant's trial, the district court received an e-mail—purportedly from a juror—who claimed to have convicted Defendant of acting negligently rather than intentionally. After the district court distributed the e-mail to the parties, Defendant moved for a new trial, arguing that the e-mail showed that his right to a unanimous guilty verdict had been violated. The district court denied the motion without a hearing, ruling that it was prohibited under Rule 11-606(B) NMRA from inquiring into the allegations of the e-mail. The district court later sentenced Defendant to life in prison, and this appeal followed.

## II.     DISCUSSION

{25}     Defendant's primary contention on appeal is that the jury instructions used at his trial incorrectly defined the criminal intent that is required to support a conviction of intentional child abuse under the State's alternate theory of child endangerment. He also argues that the district court abused its discretion when it denied his request for an evidentiary hearing on his motion for a new trial because of the e-mail the

court had received. We disagree with Defendant on both issues and affirm his conviction.

**A.    Jury Instructions**

**1.    Standard of review**

{26}    Defendant argues on appeal that the intent element of Instruction No. 10 was incomplete as it related to the State's theory of child abuse by endangerment. When given the opportunity to object to Instruction Nos. 10 and 11 at trial, however, defense counsel agreed that they were appropriate under the evidence presented.[4] Our review, therefore, is limited to fundamental error. *See Cabezuela*, 2011-NMSC-041, ¶ 21 ("The standard of review we apply to jury instructions depends on whether the issue has been preserved. . . . If the issue has not been preserved, we review for fundamental error." (internal quotation marks and citation omitted)).

{27}    "The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633 (quoting *State v. Jett*, 1991-NMSC-011,

---

[4]Defense counsel's only objection to the jury instructions was that they were inconsistent with the indictment, which did not specify that Baby was under twelve years old. The district court overruled the objection, reasoning that Baby's age at the time of her death was known at all times to Defendant, who was her father. Defendant does not challenge this issue on appeal.

14

111 N.M. 309, ¶ 19, 805 P.2d 78). With regard to jury instructions, "[t]he general rule is that fundamental error occurs when the trial court fails to instruct the jury on an essential element." *State v. Sutphin*, 2007-NMSC-045, ¶ 16, 142 N.M. 191, 164 P.3d 72. This analysis begins with determining "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Barber*, 2004-NMSC-019, ¶ 19. If so, "our obligation is 'to review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice.'" *Id.* (quoting *State v. Benally*, 2001-NMSC-033, ¶ 24, 131 N.M. 258, 34 P.3d 1134 (Baca J., dissenting)); *see also State v. Swick*, 2012-NMSC-018, ¶ 46, 279 P.3d 747 ("[F]undamental error occurs when, because an erroneous instruction was given, a court has no way of knowing whether the conviction was or was not based on the lack of the essential element.").

**2.    The jury instructions used in this case were consistent with existing law**

{28}    To find Defendant guilty, Instruction No. 10 required the jury to find that he "acted intentionally," which Instruction No. 11 defined as "when a person purposely does an act." Defendant argues that these instructions were incomplete and should have required the jury to find that he acted intentionally *and with a further intent to*

15

*abuse or harm a child*. Without the additional intent requirement, Defendant argues that the instructions permitted the jury to find him guilty of intentional child endangerment resulting in death by finding that he did *any* intentional act that eventually led to Baby's death—no matter how innocent or attenuated from her fatal injuries. For example, the jury could have convicted Defendant if it found that he intentionally "undertook [Baby's] care" by "tak[ing] her into his household," even if it believed that she ultimately died at the hands of Defendant's "friends or relations." Such a conviction, according to Defendant, would be inconsistent with the Legislature's intent to punish only the most culpable conduct as intentional child abuse. Defendant therefore argues that his conviction must be overturned because it may have been based on an endangerment theory without proof that he "intended (or even suspected) that harm would befall [Baby]."

{29} We agree with Defendant that a conviction of intentional child endangerment would be suspect if it were based on proof of some intentional act that accidentally (or even recklessly) placed Baby in a dangerous situation. We have held that criminal child abuse requires proof of conduct that is, at a minimum, "morally contemptible," rather than "merely inadvertent." *Santillanes v. State*, 1993-NMSC-012, ¶ 28, 115 N.M. 215, 849 P.2d 358. It follows that the crime of intentional child abuse requires

16

proof of an even greater level of culpability. To permit a conviction premised upon essentially innocent, though intentional, conduct would be to return to the days of treating child abuse as a strict liability crime. *See, e.g.*, *State v. Lucero*, 1982-NMSC-069, ¶ 15, 98 N.M. 204, 647 P.2d 406 ("Since child abuse is a strict liability offense, a defendant's criminal intent is not required to be proven as an element of child abuse."). That era is long behind us. *See, e.g.*, *Santillanes*, 1993-NMSC-012, ¶¶ 12-13 (declining to consider whether child abuse is a strict liability crime because the statute contains *mens rea* elements and holding that negligent child abuse requires proof of criminal negligence); *see also State v. Consaul*, 2014-NMSC-030, ¶ 37, 332 P.3d 850 (holding that a conviction of child abuse must be supported by evidence that the defendant acted at least with reckless disregard).

{30} We are not persuaded, however, that the jury instructions in this case were incomplete or permitted such a result. As we have already explained, Instruction No. 10 allowed the jury to convict Defendant if it found that he either: (1) caused Baby to be placed in a situation that endangered her life or safety; or (2) caused Baby to be tortured, cruelly confined, or cruelly punished. The instructions further required the jury to find that Defendant acted intentionally when he committed either of these acts. The instructions thus tracked UJI 14-602 and the child abuse statute nearly verbatim.

17

*See* UJI 14-602; NMSA 1978, § 30-6-1(D)(1), (2) (defining child abuse as, *inter alia*, "intentionally . . . causing . . . a child to be . . . placed in a situation that may endanger the child's life or health" or "tortured, cruelly confined or cruelly punished"). As such, the instructions given at Defendant's trial were presumptively valid. *See State v. Ortega*, 2014-NMSC-017, ¶ 32, 327 P.3d 1076 ("Uniform jury instructions are presumed to be correct."); *Jackson v. State*, 1983-NMSC-098, ¶ 5, 100 N.M. 487, 672 P.2d 660 ("When a uniform jury instruction is provided for the elements of a crime, generally that instruction must be used without substantive modification."); *see also* UJI—Criminal General Use Note ("[W]hen a uniform instruction is provided for the elements of a crime, . . . the uniform instruction should be used without substantive modification or substitution. . . . If the court determines that a uniform instruction must be altered, the reasons for the alteration must be stated in the record.").

{31}     Defendant relies on *State v. Schoonmaker* for his assertion that the intent element in the jury instructions was incomplete and should have been modified to support a theory of intentional child abuse by endangerment. *See* 2005-NMCA-012, ¶ 26, 136 N.M. 749, 105 P.3d 302, *rev'd on other grounds*, 2008-NMSC-010, ¶¶ 1, 54, 143 N.M. 373, 176 P.3d 1105, *and overruled in part by State v. Montoya*, 2015-NMSC-010, ¶ 41, 345 P.3d 1056. We are not persuaded. To start, the defendant in

18

*Schoonmaker* was convicted of *negligent* child abuse. *See* 2005-NMCA-012, ¶ 2. Moreover, *Schoonmaker* is not clear about whether the defendant was convicted of abuse by endangerment or of abuse by torture or cruel punishment. *See id.* ¶ 9 (noting that the defendant was convicted of negligent child abuse after the jury was given separate instructions on alternative theories of abuse by endangerment and abuse by torture or cruel punishment). *Schoonmaker* thus did not squarely address the intent required to prove the crime at issue in this case, *intentional* child abuse by *endangerment*. Instead, *Schoonmaker* considered the validity of the defendant's conviction of negligent child abuse and found it to comport with the law. *See generally* 2005-NMCA-012. Defendant simply reads too much into *Schoonmaker*, a case that presented very different legal and factual issues than his own. *See, e.g., Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 (" 'The general rule is that cases are not authority for propositions not considered.' " (quoting *Sangre de Cristo Development Corp. v. City of Santa Fe*, 1972-NMSC-076, ¶ 23, 84 N.M. 343, 503 P.2d 323)).

{32}     Further, the Court of Appeals in *Schoonmaker* scrutinized the jury instructions given for negligent child abuse and concluded that they were "legally sufficient." 2005-NMCA-012, ¶ 16. In fact, the Court of Appeals specifically invoked the district

19

court's reliance on UJI 14-602 to conclude that the jury had been properly instructed. *See Schoonmaker*, 2005-NMCA-012, ¶ 16 ("Since the definitions for criminal negligence and reckless disregard were incorporated into the [uniform] instruction, the jury could not have convicted [the defendant] under a lesser civil standard. To the contrary, adding the negligence language would only serve to reintroduce an ambiguity that the *Magby* court expressly wanted to avoid."). *Schoonmaker* therefore reinforced the general rule that applies in Defendant's case that the elements set forth in a UJI—indeed, the very same instruction at issue in this case—are presumptively correct. *See Ortega*, 2014-NMSC-017, ¶ 32 ("Uniform jury instructions are presumed to be correct."). *Schoonmaker* thus did not alter the proof required to support a conviction of intentional child abuse by endangerment. We therefore disagree that the elements instruction for intentional child abuse by endangerment was incomplete or otherwise inconsistent with the law.

**3.      The jury instructions were not confusing or misleading under the circumstances of this case**

{33}     We also disagree that the jury instructions were confusing or misleading in this case or resulted in a miscarriage of justice. *See Barber*, 2004-NMSC-019, ¶ 19. To repeat Defendant's argument, he contends that the instructions permitted the jury to find him guilty based on *any* intentional act that led to Baby's injuries, even if the

20

jury believed that her injuries came at the hands of Defendant's "friends or relations." While this argument may have some theoretical force in the abstract, it simply does not square with the case presented at trial. As we explain below, the evidence and arguments of the parties created little if any possibility that the jury could have found Defendant guilty based on some undefined, intentional conduct that inadvertently led to Baby's death.

{34} The State was clear throughout the proceedings against Defendant that it intended to prove that he had inflicted the injuries that resulted in Baby's death. The sole charge in the indictment was that Defendant intentionally had caused Baby "to be tortured, cruelly confined[,] or cruelly punished, to wit: a fractured skull and other injuries, which resulted in [her] death." The State did not deviate from that factual theory at Defendant's trial, as summed up in its opening statement to the jury:

> The blow to [Baby]'s head was so severe that it would have been immediately debilitating to her. She would not have looked fine after receiving that blow. She would not have looked normal. She would not have been moving around. She would not have been looking around, tracking with her eyes. She would not have been able to eat. She would have died very quickly. *The evidence in this case will show that no one but the Defendant . . . could have committed this crime.*

(Emphasis added.) And the State introduced abundant evidence at trial to support that theory, culminating in (1) expert testimony that Baby's injuries were so severe that

they could not have resulted from normal or even rough handling of a child; (2) expert testimony that the effects of Baby's injuries would have been "immediate"; and (3) Mother's testimony and Defendant's repeated statements to law enforcement that Baby was "fine" when Mother left Baby in Defendant's care when she left for her counseling appointment.

{35}    The State sharpened its theory even further after the close of the evidence in its closing argument to the jury: "Defendant committed the acts. He either slammed [Baby] in the head with his fist, her head into something or something into her head to cause[] those massive injuries and caused her to stop breathing . . . ." And the State relied on the same factual theory—that Defendant had inflicted Baby's fatal injuries—to explain the endangerment portion of the jury instruction:

> [Defendant] caused [Baby] to be placed in a situation which endangered her life or health. In the Defendant's bedroom, in his own words, he placed [Baby] in that crib when she fell asleep that morning when [Mother] was at Drug Court, he placed her there. Then he went in there to take a nap. When [Mother] left [Baby] was perfectly fine. When she left there was nothing on that floor between the crib and door except the fan. Defendant is the cause and the danger which resulted in [Baby]'s death.

Although clumsy, this argument does not suggest that the jury could convict Defendant based on some other intentional, loosely defined conduct that innocently or inadvertently led to Baby's death at the hands of another. To the contrary, the State

22

never flinched from its early decision to prove to the jury that Defendant had intentionally, violently abused Baby, resulting in her death.

{36} Defendant, by contrast, argued that Baby had already sustained her injuries before she arrived at Defendant's house on the morning of June 9th. In doing so, he focused on casting doubt on his identity as the actual abuser. Had the jury credited Defendant's argument, he would have been exonerated even under the State's theory of abuse by endangerment. We therefore see no suggestion in the evidence presented or in the arguments of the parties that the jury could have found Defendant guilty based on conduct other than inflicting Baby's fatal injuries.

{37} Thus, whether denominated as abuse by endangerment or as abuse by torture, cruel confinement, or cruel punishment, the State's case against Defendant was always based on a theory that he intentionally, physically abused Baby, resulting in her death. The State focused on proving that factual theory at trial and argued that the same evidence supported a conviction either of abuse by endangerment or of abuse by torture, cruel confinement, or cruel punishment. *Contra Consaul*, 2014-NMSC-030, ¶¶ 26, 51 (reversing a conviction of child abuse resulting in great bodily harm when the State "changed its theory of the case during trial" and argued that the jury could convict the defendant under a single jury instruction that included two

23

"different and inconsistent" factual theories of how harm occurred).

{38} And significantly, Defendant conceded at oral argument that the evidence against him was sufficient to support a conviction of abuse by torture, cruel confinement, or cruel punishment. Given the State's reliance on the same conduct to support a conviction of abuse by endangerment, Defendant's suggestion that the jury instructions may have permitted a conviction based on some other intentional conduct that led to Baby's death is too theoretical and speculative to support a claim of fundamental error. *Cf. State v. Traeger*, 2001-NMSC-022, ¶ 19, 130 N.M. 618, 29 P.3d 518 ("[T]he error in the jury instruction in this case amounts to a 'strictly legal' and a highly 'technical' objection that the doctrine of fundamental error will not protect." (quoting *State v. Cunningham*, 2000-NMSC-009, ¶ 12, 128 N.M. 711, 998 P.2d 176)).

{39} As a final matter, we note that this would not have been an appealable issue had the jury not been instructed on child abuse by endangerment. It appears from the record that the State first introduced child endangerment as an alternate basis for conviction when it tendered its jury instructions near the close of the evidence. The addition of child endangerment to the jury instructions created an unnecessary appellate issue when the State had such a strong case of abuse by torture, cruel

24

confinement, or cruel punishment. *See State v. Nichols*, 2016-NMSC-001, ¶ 39 n.3, 363 P.3d 1187 (noting "that Section 30-6-1(D)(2) [abuse by torture, cruel confinement, or cruel punishment] would be a better fit" for the State's theory of the case than child endangerment when the State's primary argument was that the defendant had inflicted the injury that resulted in the child's death); *see also id.* ¶ 47 (describing child abuse under Section 30-6-1(D)(2) as battery); *State v. Pierce*, 1990-NMSC-049, ¶ 42, 110 N.M. 76, 792 P.2d 409 ("In their ordinary senses, these terms [torture and cruelly punish] connote . . . acts of violence."); *State v. Chavez*, 2009-NMSC-035, ¶ 15 ("Child abuse by endangerment, *as opposed to physical abuse of a child*, is a special classification [of child abuse] designed to address situations where an accused's conduct exposes a child to a significant *risk* of harm, even though the child does not suffer a physical injury." (first emphasis added) (internal quotation marks and citation omitted)). The jury instructions were not confusing or misleading under the facts of this case.

**B.    Evidentiary Hearing on Defendant's Motion for a New Trial**

{40}    Defendant's second claim of error is that the district court abused its discretion by denying him an evidentiary hearing on his motion for a new trial. We hold that the district court did not abuse its discretion.

25

## 1.      Procedural background

{41}      Approximately three weeks after the jury found Defendant guilty, the district court entered a minute order finding that a juror who had participated in Defendant's trial had attempted to contact the district court by telephone. The order detailed that the district court did not answer or speak to the juror and that the juror then submitted an e-mail through administrative court staff, which was placed in the possession of the court reporter, attached as an exhibit to the minute order, and forwarded to counsel of record in the case. According to the district court, the e-mail in part stated:

> [M]y understanding is that I found him guilty for not taking action in caring for his daughter[']s well being such as neglect but not him actually murdering her[. T]his was my interpretation as well as other jury members, but after I have had time to process this I am wondering if I misunderstood because as you pro[b]ably already know the media is insinuating murder.

{42}      Defendant moved for a new trial based on the e-mail, contending that he had been denied his right to a unanimous jury verdict under the United States and New Mexico Constitutions. Defendant argued that he had been charged with intentional child abuse and that "[t]he theory of a possibility of the verdict of guilt by negligence was not charged to the jury and was not raised by the evidence." Based on the juror's email, Defendant argued that the jury's guilty verdict was improper, either because: (1) some of the jurors had convicted him based on a theory of negligent abuse and

26

others had convicted him of intentional abuse; or (2) all of the jurors had convicted him of negligent abuse, a crime which had not been charged or submitted to the jury. Defendant, therefore, asked the district court to conduct a voir dire of the jurors and to grant him a new trial, if one or more testified that they had convicted Defendant of acting negligently.

{43}     The district court denied Defendant's motion for a new trial without a hearing. In an order containing detailed findings of fact and conclusions of law, the district court noted that Defendant had been charged only with intentional child abuse and that the jury instructions required the jury to find that he had "acted intentionally and without justification," without mentioning a theory of recklessness, negligence, or a failure to act. The district court further noted that it had offered to poll the jury after it returned its guilty verdict, and that Defendant had declined the district court's offer.

{44}     As for the e-mail, the district court found that it could not verify that it had been written by an actual juror. In fact, the district court was careful to explain that it "specifically [did] *not* find that the e-mail which forms the basis for this motion was actually written by a juror." The district court nevertheless concluded that, even had the e-mail been written by a juror, Defendant's motion still would have been denied. The district court reasoned that it could not consider the e-mail under Rule 11-

27

606(B), which prohibits receiving testimony or evidence of a juror's statement during an inquiry into the validity of a verdict unless the statement relates to one of three "narrow exceptions." The district court concluded that, because the contents of the e-mail did not meet one of the rule's exceptions, it did not support Defendant's motion for a new trial. The district court also noted that Defendant had refused its offer to poll the jury, which would have required each juror to confirm the verdict of intentional child abuse, and it concluded that Rule 11-606(B) prohibited the district court from conducting a voir dire of the jurors into the matters raised by the e-mail. The district court thus denied the motion.

## 2. Standard of review

{45} On appeal, Defendant argues that the district court's denial of a hearing to voir dire the members of the jury was an abuse of discretion. He also contends that the possibility that some of the jurors believed that they were convicting him "only of neglect" violated his right to a unanimous jury verdict and requires a new trial. We review the district court's denial of the motion for a new trial for a "manifest abuse of discretion." *State v. Garcia*, 2005-NMSC-038, ¶ 7, 138 N.M. 659, 125 P.3d 638.

## 3. The district court did not abuse its discretion

{46} Rule 11-606(B)(1) prohibits receiving testimony or evidence from a juror about

28

"any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment," unless the statement relates to one of three exceptions set forth in the rule:

(2) **Exceptions.** A juror may testify about whether

(a) extraneous prejudicial information was improperly brought to the jury's attention;

(b) an outside influence was improperly brought to bear on any juror; or

(c) a mistake was made in entering the verdict on the verdict form.

Rule 11-606(B)(2).[5] Defendant contends on appeal that the e-mail in this case meets the first exception set forth in Rule 11-606(B)(2) because the jury instructions, "which misled the jury about the elements of the crime, constituted 'extraneous' information, that is, information that was contrary to, and therefore beyond the proper limits of, the law."

---

[5]While Defendant's case was pending in the district court, "Rule 11-606 . . . was amended in 2012 to be consistent with the restyling of the Federal Rules of Evidence." Rule 11-606 committee commentary. The amendments were "intended to be stylistic only" and were not intended "to change any result in any ruling on admissibility." *Id.* To avoid confusion, all references in this opinion to Rule 11-606 are to the rule that is currently in effect.

29

{47} Defendant's argument fails for several reasons. First, we have already held that the jury instructions in this case properly set forth the elements of the crime of intentional child abuse. We therefore hold that Defendant's argument that the instructions constituted "extraneous" information under Rule 11-606(B)(2)(a) is without merit.

{48} Second, we agree with the State that this argument was not properly preserved. In the district court Defendant relied exclusively on the exception set forth in Rule 11-606(B)(2)(c), that the matters described in the e-mail were evidence of "a mistake in [] entering [the] verdict on the [verdict] form." Indeed, the district court specifically found that Defendant had not made any "suggestion that the jury received extraneous prejudicial information," and it therefore concluded that the exception set forth under Rule 11-606(B)(2)(a) did not apply. As a result, Defendant's argument that the e-mail was admissible under Rule 11-606(B)(2)(a) was not preserved for appellate review. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . .").

{49} Last, we agree with the State that the district court's denial of Defendant's motion is supported by *State v. Sena*, in which we affirmed the denial of a motion for a new trial under Rule 11-606(B). *See* 1987-NMSC-038, ¶¶ 7, 9, 105 N.M. 686, 736

30

P.2d 491. In *Sena*, the defendant introduced the affidavits of a juror and of a spectator present during defendant's trial who claimed to have witnessed juror misconduct. *See id.* ¶ 8. We held that the district court did not abuse its discretion under Rule 11-606(B) because the juror's affidavit "[did] not indicate that extraneous material [had] reached the jury," and the spectator's affidavit offered only a "vague and uncorroborated" allegation of inattention. *Sena*, 1987-NMSC-038, ¶ 9. The e-mail in this case—which the district court could not even verify had been sent by an actual juror—offers less support for ordering a new trial than did the affidavits in *Sena*. The district court did not abuse its discretion when it denied Defendant's motion for a new trial.

## III.    CONCLUSION

{50}    We reject the two issues raised by Defendant in this direct appeal and affirm his conviction.

{51}    **IT IS SO ORDERED.**

_____

**BARBARA J. VIGIL, Justice**

31

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**JUDITH K. NAKAMURA, Justice**

32