This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: May 6, 2024**

**No. S-1-SC-39751**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JUAN LERMA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler-Gray, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Ellen Venegas, Assistant Attorney General
Santa Fe, NM

for Appellee

### DECISION

**THOMSON, Chief Justice.**

**{1}** Defendant Juan Lerma appeals his conviction for intentional child abuse resulting in death of a child under twelve (Intentional Child Abuse). Defendant contends that (1) the jury instructions issued by the district court resulted in fundamental error because they conflated Intentional Child Abuse and reckless disregard resulting in the death of a child under twelve years of age (Reckless Child Abuse), (2) the district court infringed

upon his right of confrontation and his right to a fair trial by unduly restricting cross-examination of the State's key witnesses, and (3) prosecutorial misconduct denied him his right to a fair trial.

**{2}** We affirm the findings of the district court by nonprecedential decision. *See* Rule 12-405(B)(1) NMRA (allowing for disposition by nonprecedential decision when the issues have already been decided by New Mexico's appellate courts).

## I. BACKGROUND

**{3}** Eight-year-old S.R. and her brother, nine-year-old M.L., moved in with their father, Defendant, following their mother's death. A few months later, S.R. moved from Defendant's home and began living with her paternal grandmother, Esmeralda. One evening, S.R. spent the night at Defendant's home. When Esmeralda returned for her the next day, Defendant informed her that S.R. had died and that he put her body in trash bags. Esmeralda left Defendant's home and contacted Defendant's brother to explain what she had just been told, and together the two reported Defendant's statements to the police. Three hours later, the police recovered S.R.'s lifeless body, wrapped in trash bags and placed in a trash can behind his house.

**{4}** The Office of the Medical Investigator (OMI) examined S.R.'s body at the scene and noted old bruising on S.R.'s arms and legs. Otherwise, they found no signs of trauma. The next day a board-certified forensic pathologist conducted S.R.'s autopsy and concluded that S.R.'s cause of death was blunt force trauma to the head, evidenced by both a subdural hematoma and diffuse axonal injury. The forensic pathologist ruled that the manner of S.R.'s death was homicide.

**{5}** Defendant was charged and convicted of Intentional Child Abuse, a first-degree felony, and Tampering with Evidence, a third-degree felony, and was sentenced to life in prison plus three years. Defendant now appeals his conviction for Intentional Child Abuse to this Court. *See* Rule 12-102(A)(1) NMRA (requiring this Court to decide "appeals from the district courts in which a sentence of death or life imprisonment has been imposed").

## II. DISCUSSION

### A. The Jury Instructions Were Not Erroneous and Did Not Result in Fundamental Error

### 1. Unpreserved Claims of Error

**{6}** At trial, the jury received separate instructions for Intentional Child Abuse and Reckless Child Abuse and step-down instructions for reaching a verdict. Because Defendant did not preserve his challenge to these instructions, we review the propriety of the issued jury instructions for fundamental error. *State v. Cabezuela*, 2011-NMSC-041, ¶ 21, 150 N.M. 654, 265 P.3d 705. This Court will reverse a conviction for fundamental error "only if the defendant's guilt is so questionable that upholding a conviction would shock the conscience, or where, notwithstanding the apparent

culpability of the defendant, substantial justice has not been served." *State v. Silva*, 2008-NMSC-051, ¶ 13, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks and citation omitted). As in this case where "the prejudicial effect is minimal and the evidence of the defendant's guilt is overwhelming, the error does not rise to the level of fundamental error." *State v. McDowell*, 2018-NMSC-008, ¶ 18, 411 P.3d 337.

## 2.      Intentional Child Abuse Jury Instructions

**{7}**      To determine whether jury instructions resulted in fundamental error, our review "begins with determining 'whether a reasonable juror would have been confused or misdirected' . . . ." *State v. Lucero*, 2017-NMSC-008, ¶ 27, 389 P.3d 1039 (quoting *State v. Barber*, 2004-NMSC-019, ¶ 19, 135 N.M. 621, 92 P.3d 633). We also consider whether the instructions "fairly and accurately state the applicable law." *Cabezuela*, 2011-NMSC-041, ¶ 21 (internal quotation marks and citation omitted).

**{8}**      "Uniform jury instructions are presumed to be correct," *Lucero*, 2017-NMSC-008, ¶ 30 (internal quotation marks and citation omitted), and "become the law of the case against which the sufficiency of the evidence is to be measured," *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted). "When a uniform jury instruction is provided for the elements of a crime, generally that instruction must be used without substantive modification." *Lucero*, 2017-NMSC-008, ¶ 30 (internal quotation marks and citation omitted).

**{9}**      The jury instruction used at trial on the charge of Intentional Child Abuse reads,

> For you to find Juan Lerma guilty of intentional child abuse resulting in death of a child under twelve (12) years of age, as charged in Count 1, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.  Juan Lerma did grab, push, hit, throw on the ground, kick, and/or refused to seek medical or other care, when able to do so, necessary for the well-being of his daughter, [S.R.]
> 2.  By engaging in the conduct described in Paragraph 1, Juan Lerma caused his daughter, [S.R.], to be placed in a situation that endangered the life or health of [S.R.] or caused [S.R.] to be tortured or cruelly punished.
> 3.  Juan Lerma acted intentionally and without justification. To find that the defendant acted intentionally, you must find that it was the defendant's conscious objective to endanger, torture, or cruelly punish the child, [S.R.].
> 4.  Juan Lerma's conduct resulted in the death of his daughter, [S.R.].
> 5.   [S.R.] was under the age of twelve (12).
> 6.  This happened in New Mexico on or about the 1st day of August 2020.

*See* UJI 14-623 NMRA.

**{10}**      Defendant first argues that the instruction allowed the jury to find him guilty of Intentional Child Abuse solely for a "refusal to seek medical or other care," which he

argues is a theory only permitted for reckless child abuse, citing this Court's holding in *State v. Consaul*, 2014-NMSC-030, ¶ 26, 332 P.3d 850 (requiring separate jury instructions for intentional and reckless child abuse). Defendant is incorrect.

**{11}** In *State v. Garcia* we established that refusal to seek medical care may be adequate legal grounds for a theory of Intentional Child Abuse, stating that "medical neglect[ under] a theory of child abuse by endangerment . . . [i]s viable so long as it is supported by the evidence presented at trial." 2021-NMSC-019, ¶ 19, 488 P.3d 585. The availability of this theory is further supported by the New Mexico Child Abuse Statute which provides:

> Abuse of a child consists of a person knowingly, intentionally, or negligently, and without justifiable cause, causing or permitting a child to be:
>
> > (1) placed in a situation that may endanger the child's life or health;
> > (2) tortured, cruelly confined or cruelly punished; or
> > (3) exposed to the inclemency of weather.

NMSA 1978 § 30-6-1(D) (2009).

**{12}** A defendant's intentional refusal to seek medical care places a child in a "situation that may endanger the child's life or health," which the statute provides can be done "knowingly, intentionally, or negligently." Section 30-6-1(D)(1); *see also* UJI 14-626 NMRA comm. cmt. 1. ("[I]t is possible to commit any form of child abuse either recklessly or intentionally."). The jury instructions' elements tracked the elements of the child abuse statute and UJI 14-623 and therefore were presumptively valid. *Lucero*, 2017-NMSC-008, ¶ 30 (holding that the jury instructions "were presumptively valid" when they were in accordance with "the child abuse statute" and the uniform jury instructions). A reasonable juror would not have been confused or misdirected as the jury was instructed on an accurate statement of the law.

**{13}** Defendant next argues that even if the State could "pursue a theory of intentionally failing to seek medical care," it would have to prove that Defendant's intentional refusal to obtain medical care was the "but-for cause of death." Because there was sufficient evidence to support a theory of Intentional Child Abuse, on which the jury convicted Defendant, there is no need to examine Defendant's misplaced causation argument invoking medical neglect. *See State v. Godoy*, 2012-NMCA-084, ¶ 6, 284 P.3d 410 ("[W]here alternative theories of guilt are put forth under a single charge, jury unanimity is required only as to the verdict, not to any particular theory of guilt.").

**{14}** The evidence supporting Intentional Child Abuse begins with Defendant's own testimony. He told the jury that on the day before she was discovered deceased, he spanked S.R. to discipline her for misbehaving and that the spankings with a strap took place in his bedroom, where M.L. was playing video games. After the second of the three intended strikes with the strap, Defendant stated that S.R. began to have a

seizure on the floor and that he rolled her on her side and put a blanket over her. Defendant told the jury that on the same day and after dinner at eleven p.m. he laid S.R. on the couch to sleep, woke up around lunch time the next day, and called out for her to wake up and help him make breakfast. When S.R. did not respond, Defendant became angry, went to the couch, pulled down the blanket that was covering her, and discovered that S.R. was deceased. Driven by panic and the alleged desire to protect M.L. from the trauma of seeing his deceased sister, Defendant admitted to placing S.R. inside multiple trash bags and to disposing of her body in the trash as a means to avoid any suspicion or questions from M.L. Defendant then went into the bedroom and played video games with M.L. until Esmeralda arrived.

**{15}** Esmeralda testified that when she went to pick up her granddaughter at Defendant's home, Defendant told her that S.R. had died and described what he had done with her body. Defendant told Esmeralda he could avoid the consequences of his actions if he said that S.R. had run away or if he buried or burned her body. He later resorted to threats, telling Esmeralda not to contact the police and warning, "If I go down, you'll go down with me."

**{16}** M.L. also testified, telling the jury that Defendant was violent towards him and S.R. and would beat them several times a week. The beatings included inflicting "heavy blows to the lower and upper torso and face," throwing M.L. across the room, hitting S.R. with a two-by-four, and doing "anything [Defendant] could do to make [them] feel pain." According to M.L., he witnessed Defendant beating S.R. more severely than normal on the day before the day police found her lifeless in a trash can. M.L. testified that on that day Defendant "started kicking her and cussing at her," and she fell to the ground. When S.R. then started making unusual rasping noises, Defendant put a comforter over her and kicked her, and the noises stopped.

**{17}** The forensic pathologist provided an expert opinion that S.R.'s cause of death was blunt force trauma to the head and her manner of death was homicide, stating that she had only seen subdural hematomas and diffuse axonal injury in children when they resulted from severe injury caused by a car accident, a fall from an extensive height, or an intentionally inflicted injury. The forensic pathologist could identify no evidence that S.R.'s injuries resulted from anything other than intentionally inflicted trauma.

**{18}** Finally, the jury was able to consider Defendant's demeanor after his arrest. Through a recorded jail phone call, Defendant told his mother that he would not be taking "the fall that [he was] about to take" if he would have had more time. Throughout the call, Defendant showed little regard for S.R., referring to her as "the little girl," and he appeared indifferent when Esmeralda explained her feelings of loss for S.R. In weighing Defendant's credibility, a jury could have easily found Defendant's behavior was inconsistent with that of a grieving father.

**{19}** Considering the evidence reinforcing the State's unwavering theory that Defendant intentionally caused S.R.'s death, we conclude that sufficient evidence supported the conviction of Intentional Child Abuse.

**B.    Alleged Prosecutorial Misconduct Did Not Deny Defendant a Fair Trial**

**{20}**    Defendant raises multiple allegations of prosecutorial misconduct for our review. Three arguments were preserved, and four were not.

**1.    Preserved Claims of Prosecutorial Misconduct**

**{21}**    We review preserved claims of prosecutorial misconduct for abuse of discretion. *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728. "Discretion is abused when the decision is 'clearly against the logic and effect of the facts and circumstances before the court.'" *Lucero*, 1999-NMCA-102, ¶ 32 (citation omitted). First, Defendant claims that the State engaged in an improper appeal to the jury's emotions during its closing argument where the prosecutor made the following statement regarding M.L.'s testimony,

> What makes sense is what's in front of you, is that you had a boy who was trying to be the voice of his little sister because she had none. Because her voice was taken away from her by her father. He was trying to be the voice for all children in Eddy County.

**{22}**    Defendant objected to the prosecutor's statement as an improper appeal to the jury's emotions by implying that convicting Defendant would protect all children of Eddy County. After a bench conference, the district court judge instructed the State to move on but did not issue a correcting instruction. The State resumed its closing without further or similar reference to the prosecution's language that drew the objection.

**{23}**    One factor that is helpful in analyzing the propriety of a prosecutor's comments during closing argument is "whether the statement is isolated and brief, or repeated and pervasive." *State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348 (discerning three factors that greatly influence this Court's analysis of alleged prosecutorial misconduct). Courts must evaluate statements "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id.* "During closing argument, both the prosecution and defense are permitted wide latitude, and the trial court has wide discretion in dealing with and controlling closing argument," *Smith*, 2001-NMSC-004, ¶ 38, 130 N.M. 117, 19 P.3d 254 (internal quotation marks and citation omitted) (examining a prosecutor's comments in closing as improperly calling attention to the defendant's silence at trial). Nevertheless, a prosecutor's closing argument "must be based upon the evidence or be in response to the defendant's argument." *Id.*

**{24}**    The statement that that M.L. was trying to be the voice of his deceased sister is not improper and was based on the evidence at trial. The problem arises in the second part of the statement, where the prosecution suggests M.L. is not just testifying on S.R.'s behalf, but as "the voice for all children in Eddy County." This comment justified the State's objection, and that objection was properly sustained. A curative instruction was likely appropriate and was not requested or provided.

**{25}**     This kind of pandering to the jury to decide the case on other than the particular guilt or innocence of the defendant is unprofessional, but it is not grounds for reversal. The test is whether the alleged improper prosecutorial comments "deprive the defendant of a fair trial." *Id.* (internal quotation marks and citation omitted). *Smith* instructs us that, generally, "an isolated comment made during [a] closing argument is not sufficient to warrant reversal." *Id.* While it was an improper statement, it was isolated, was not repeated, and does not violate the standard for reversing a jury verdict "because a fair trial is not necessarily a perfect one." *Allen*, 2000-NMSC-002, ¶ 95. While the trial court did not offer curative instructions, the jury was instructed that "[its] verdict should not be based on speculation, guess or conjecture" and that "[n]either sympathy nor prejudice should influence [its] verdict." "We presume that the jury followed the instructions given by the trial court, not the arguments presented by counsel." *State v. Benally*, 2001-NMSC-033, ¶ 21, 131 N.M. 258, 34 P.3d 1134.

**{26}**     Next, Defendant argues that the State mischaracterized M.L.'s testimony. M.L. testified that he saw Defendant checking S.R. for internal injuries. However, the State's inaccurate elaboration on M.L.'s testimony told the jury that Defendant had admitted to checking on S.R. This was a mischaracterization of the evidence. However, Defendant objected, the district court sustained the objection, and employed the appropriate safeguard by correcting the record for the jury. Prejudice is generally avoided when a trial court "correct[s] any impropriety by striking statements and offering curative instructions." *Sosa*, 2009-NMSC-056, ¶ 25.

**{27}**     Finally, Defendant challenges the State's use of a photo of S.R. during its opening statement that remained on display to the jury during Defendant's opening statement, alleging that it was not appropriate because "it was never offered into evidence or published." However, the record shows that both parties stipulated to the photo and that the trial court allowed both parties to publish stipulated photos automatically. Regardless, because the court addressed the objection by instructing the State to take down the photo, which it did. Defendant's challenge fails.

## 2.     Unpreserved Claims of Prosecutorial Misconduct

**{28}**     Defendant presents four unpreserved claims of prosecutorial misconduct, which we review for fundamental error. *Allen*, 2000-NMSC-002, ¶ 95. Fundamental error results when the prosecutor's conduct was "so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.* (internal quotation marks and citation omitted).

**{29}**     First, Defendant challenges the State's reference to S.R.'s "trash life" and its characterization of Defendant as a "trash dad" during their opening argument. As the record demonstrates, it is undisputed that Defendant placed S.R.'s body in the trash. The State's opening theme does not rise to the level of fundamental error because it is based on the evidence of the case and was isolated and brief in the context of the entire trial. *See State v. Swavola*, 1992-NMCA-089, ¶¶ 8-9, 114 N.M. 472, 840 P.2d 1238 (allowing that an opening statement's "colorful choice of words may . . . express a conclusion based on the forthcoming evidence" despite its "argumentative" language).

These statements did not prejudice Defendant and, considering the overwhelming evidence of Defendant's guilt, did not result in fundamental error.

**{30}** Second, Defendant argues that the State engaged in prosecutorial misconduct because a specific line of questioning in the State's examination of Esmeralda was improper and prejudicial. Esmeralda had previously testified that Defendant told her he would not be in this situation if he had an additional twenty-four hours. The prosecution asked Esmeralda five times what she thought Defendant meant by that statement. Esmeralda repeatedly responded that she did not know, prompting the question, "Do you think that he meant bury or burn the body like he stated earlier?" Defendant's argument on this point is undeveloped and does not articulate how this line of questioning resulted in prejudice. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (explaining that the appellate court does not review unclear or undeveloped arguments). Leading questions of Esmeralda were proper because she was considered a hostile witness. More importantly, the jury heard Esmeralda's earlier testimony that Defendant told her he planned to hide S.R.'s death by saying she ran away, by burying her, or by burning her body. Therefore, this questioning did not result in fundamental error.

**{31}** Third, Defendant argues that the State elicited hearsay about what Defendant's brother said to the police, resulting in prejudice. At trial, an officer and a detective testified about their initial but separate conversations with Defendant's brother, where he told them that Defendant had killed S.R. Like Defendant's previous claim, this argument is undeveloped. *Id.* Even if Defendant could demonstrate the testimony was hearsay, it was not sufficiently prejudicial to result in fundamental error because the jury had already heard testimony from Esmeralda incriminating Defendant. *See State v. Trujillo*, 2002-NMSC-005, ¶¶ 54-56, 131 N.M. 709, 42 P.3d 814 (holding that improper hearsay testimony did not result in fundamental error because the jury also heard the same testimony from other eyewitnesses).

**{32}** Finally, Defendant argues prosecutorial misconduct occurred when the State elicited testimony from a detective about discoveries made during the examination of S.R.'s body. The detective stated that OMI noted bruising on S.R.'s inner thighs. Before the detective could complete the sentence, Defendant objected stating there was no evidence of sexual misconduct, which the detective's testimony might suggest if allowed. The State was told to caution its witness, and the witness continued testifying without reference to a possible sexual assault, simply noting, "There was some abnormal bruising on her thighs, so they were going to look into i[t] further." Again, Defendant's argument is undeveloped and does not explain how the testimony resulted in prejudice. *See Headley*, 2005-NMCA-045, ¶ 15. If the Defendant is somehow now alleging the detective's statement was hearsay, this argument was not preserved at trial. The only objection was the concern that the statement would alert the jury to possible allegations of sexual misconduct, and the Court dealt with that matter appropriately. Therefore, Defendant's argument is without merit, and this line of questioning did not result in fundamental error.

### 3. Cumulative Harmless Error Analysis

**{33}** Defendant argues that, cumulatively, the alleged prosecutorial misconduct was not harmless. Cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (internal quotation marks and citation omitted). Cumulative error cannot apply where the record indicates that a defendant received a fair trial. *Id.*

**{34}** In total, Defendant alleges seven instances of prosecutorial misconduct. Of the seven, only three of the claims were preserved. Two of the preserved claims did not incur error because the parties had stipulated to the use and publication of S.R.'s photo in one of the two and the court issued correcting instructions in the other. The third, regarding the prosecution's mention of "all children in Eddy County," is the most meritorious of the claims. However, this statement was isolated in the context of the trial, and the jury was instructed to not to issue its verdict on the basis of sympathy or prejudice.

**{35}** Of the four unpreserved claims, Defendant only developed two, but none of the four claims caused significant prejudice to Defendant to rise to the level of fundamental error. Therefore, the State's conduct did not amount to cumulative error because "(1) the trial court did not commit the many errors defendant claims were cumulative, and (2) a reading of the entire record demonstrates that he received a fair trial." *See State v. Victorian*, 1973-NMSC-008, ¶ 36, 84 N.M. 491, 505 P.2d 436.

### C. The District Court Did Not Unduly Restrict Defendant's Cross-Examination of Esmeralda or M.L.

**{36}** Defendant argues that the district court unduly restricted his right to cross-examine Esmeralda and M.L., thereby infringing on Defendant's constitutional right of confrontation and his right to a fair trial.

### 1. Defendant Did Not Preserve His Claim of Constitutional Error

**{37}** "To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. This Court stated that the preservation requirement "alert[s] the trial court to error in time for correction" and "give[s] opposing counsel fair opportunity to meet the objection." *State v. Johnson*, 1996-NMSC-075, ¶ 11, 122 N.M. 696, 930 P.2d 1148. Here, the State only objected to Defendant's questions based on the evidentiary rules of relevance and scope of cross-examination.

### 2. Standard of Review

**{38}** Defendant's constitutional argument was unpreserved, so we review for fundamental error. *Cabezuela*, 2011-NMSC-041, ¶ 49. We begin our review by first determining whether an error occurred in Esmeralda's cross-examination. *See id.* A

constitutional error in cross-examination occurs only when cross-examination is unduly restricted. *Smith*, 2001-NMSC-004, ¶ 19.

### a.    Esmeralda's cross-examination

**{39}**    Defendant argues that the district court unduly restricted Esmeralda's cross-examination because it did not allow Defendant to elicit facts about what Esmeralda told the police and about her observations of S.R. on July 31, the day before the discovery of S.R.'s body. The State objected to Defendant's questioning, alleging it exceeded the scope of their direct examination, which only focused on Esmeralda's conversations with police on August 1. Defendant asserts that it was essential to point out that Esmeralda's statement to the police differed from her testimony at trial that she saw nothing alarming on July 31. Because of the alleged restriction of cross-examination, Defendant argues that he was unable to "give the jury a complete picture of Esmeralda's knowledge of what happened to S.R."

**{40}**    It is well established that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting a witness's credibility." Rule 11-611(B) NMRA. We review a trial court's rulings and restrictions on the scope of cross-examination for abuse of discretion. *State v. Silva*, 2007-NMCA-117, ¶ 21, 142 N.M. 686, 168 P.3d 1110 (*rev'd on other grounds*, 2008-NMSC-051, ¶ 16). The district court has exercised proper discretion in restricting Defendant's cross-examination to the subject matter of direct examination to ensure a fair and efficient trial. *State v. Samora*, 2016-NMSC-031, ¶ 43, 387 P.3d 230; *see* Rule 11-611(A).

### b.    M.L.'s cross-examination

**{41}**    Defendant argues that cross-examination of M.L. was unduly restricted. Defendant attempted to impeach M.L. with prior inconsistent statements but struggled with the correct form of the questions. Defendant's questioning was vague and not specific about a particular statement and instead was broadly framed around whom M.L. spoke to about S.R.'s death and the substance of those conversations. The district court repeatedly instructed Defendant to be direct in his questioning. Although Defendant claimed there were many prior inconsistent statements, he could not identify any specifically, nor were the questions formed to inquire directly about those statements. The State objected on the grounds of relevance and scope because these questions exceeded the scope of the direct examination. The Court sustained the objections and provided some guidance on how to properly form a question about an alleged prior inconsistent statement. Defendant ultimately followed the district court's guidance, but only asked M.L. about a specific statement made during a safe house interview. Then after many minutes of cross-examination about M.L.'s bicycle and his favorite video games, the district court again sustained objection due to relevance of the questioning and time management. Reviewing the trial court's restrictions for abuse of discretion, we hold that the district court did not abuse its discretion by restricting Defendant's cross-examination to the subject matter of direct examination. *See Silva*, 2007-NMCA-117, ¶ 21 (*rev'd on other grounds*, 2008-NMSC-051, ¶ 16); *Samora*, 2016-

NMSC-031, ¶ 43; Rule 11-611(A). Therefore, the district court did not unduly restrict Defendant's cross-examination of M.L.

**{42}** Because the district court did not unduly restrict either Esmeralda's or M.L.'s cross-examination, there was no violation of the Confrontation Clause, and accordingly there is no constitutional error to review. *Smith*, 2001-NMSC-004, ¶¶ 19, 24.

## III. CONCLUSION

**{43}** For the reasons stated above, we affirm the district court's findings and Defendant's conviction.

**{44}  IT IS SO ORDERED.**

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**